UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

MARK DAVID JOHNSON,

     Petitioner-Appellant,

v.

GARY GIBSON, Warden, Oklahoma
State Penitentiary,

     Respondent-Appellee.

No. 00-7008

---

ORDER
Filed June 27, 2001

---

Before **KELLY**, **BALDOCK**, and **HENRY**, Circuit Judges.

---

The order and judgment dated April 27, 2001, shall be published. A copy
of the published opinion is attached.

Entered for the Court
Patrick Fisher, Clerk of Court

By:
    Amy Frazier
    Deputy Clerk

F I L E D
United States Court of Appeals
Tenth Circuit

APR 27 2001

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

MARK DAVID JOHNSON,

      Petitioner - Appellant,

vs.

GARY GIBSON, Warden, Oklahoma
State Penitentiary,

      Respondent - Appellee.

No. 00-7008

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. No. 98-CV-331)

---

Stephen J. Greubel, Tulsa, Oklahoma, for Petitioner - Appellant.

William L. Humes, Assistant Attorney General (and W.A. Drew Edmondson,
Attorney General, on the brief), Oklahoma City, Oklahoma, for Respondent -
Appellee.

---

Before **KELLY**, **BALDOCK**, and **HENRY**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

    Petitioner-appellant Mark David Johnson appeals the district court's denial

of habeas relief, *see* 28 U.S.C. § 2254, from his Oklahoma first degree malice

murder conviction and death sentence. Johnson was convicted of acting with

Ricky Masquat to beat and set afire Billy Webb, resulting in Webb's death. Johnson and Masquat lived and worked at an apartment complex in Norman, Oklahoma. The thirty-three year old victim lived with his mother in that same complex. Residents described the victim as friendly, but a little strange, slow, childlike, and as having mental problems. He spent most of his time walking around the apartment complex and playing with the children who lived there. Johnson expressed concerns that Webb would harm the children. Three days before the murder, Johnson, in Masquat's presence, stated to the apartment manager that Webb was evil and that if Johnson ever thought that Webb would hurt the manager's children, Johnson would take a baseball bat to Webb, pour gasoline on him and burn him up--then no one would ever have to worry about Webb again.

Three days later, Johnson, Masquat and Webb left the apartment complex in Masquat's pickup truck. Webb had told another resident that he was going "partying." The next morning, the victim was found on a deserted country road one hundred miles south of Norman. He had suffered second and third degree burns over more than ninety-five percent of his body, wounds which would eventually prove fatal. He had also been hit over the head, although that wound was itself not life threatening. Despite his injuries, Webb remained alert and coherent for approximately seventeen hours after the attack. He was able to

describe Johnson and Masquat as his attackers, indicating Johnson had hit him over the head with a baseball bat and Masquat had doused him with gasoline and set him on fire. Webb said the pair had accused him of "messing" with some children, but that was not true.

The highway patrol arrested Johnson and Masquat shortly after the attack. In the bed of Masquat's truck was a baseball bat with blood matching the victim's blood type, a plastic container that tests showed had previously contained gasoline and several empty beer bottles. A cap fitting the plastic gasoline container in the truck bed was found near the site of the attack, as was a beer bottle like the ones found in Masquat's truck. Tests revealed traces of gasoline on Johnson's shorts, and blood, similar to Webb's, on Johnson's shirt. Masquat had blood spots, of the same type as the victim, on his boots and the lower ten inches of his jeans, and singe or burn marks on his shirt.

The State tried Johnson and Masquat separately. At his trial, Johnson's defense was that he had only hit Webb over the head with a baseball bat, but that it was Masquat who had doused Webb with gasoline and set him on fire. Johnson also argued that, in light of his brain damage and low IQ, combined with his having drunk alcohol that night, he was unable to form the requisite intent to kill Webb. The jury rejected these defenses and convicted Johnson of first degree malice murder.

At sentencing, the jury found the two alleged aggravating factors--the murder was especially heinous atrocious or cruel and Johnson was a continuing threat to society. The jury sentenced Johnson to death. The Oklahoma Court of Criminal Appeals affirmed Johnson's conviction and sentence, *see Johnson v. State*, 928 P.2d 309 (Okla. Crim. App. 1996), and denied post-conviction relief in an unpublished decision.

Johnson then filed a federal habeas petition. Because he filed that petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), that act governs this appeal. *See Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 1518 (2000). Johnson, therefore, will not be entitled to habeas relief unless he can establish that the state court determination of his claims was contrary to, or an unreasonable application of, clearly established Supreme Court precedent, *see* 28 U.S.C. § 2254(d)(1), or an unreasonable determination of the facts in light of the evidence. *See id.* § 2254(d)(2). We presume state court factual findings are correct, absent clear and convincing evidence to the contrary. *See id.* § 2254(e)(1). Where the state courts did not address the merits of a habeas claim, we instead review the district court's legal determinations *de novo*, and any factual findings only for clear error. *See Thomas v. Gibson*, 218 F.3d 1213, 1220 (10th Cir. 2000). The district court granted Johnson a certificate of appealability on the following claims. *See* 28 U.S.C.

§ 2253.

## I. *Voir dire.*

**A.** ***Failure to excuse for cause juror who would automatically vote for death sentence.*** Johnson asserts the trial judge, contrary to *Morgan v. Illinois*, 504 U.S. 719, 729 (1992), failed to excuse for cause prospective juror Whitely, after she indicated she would automatically vote for death if the jury convicted Johnson of first degree murder. Defense counsel, however, passed Whitely for cause. The Oklahoma Court of Criminal Appeals, therefore, deemed Johnson to have waived this claim. *Johnson*, 928 P.2d at 314.

As cause excusing this default, Johnson now argues that his trial attorney was ineffective for failing to seek Whitely's removal for cause. Johnson, however, never raised this particular ineffective assistance claim in state court, either on direct appeal or in his state post-conviction application. This ineffective-assistance claim, therefore, remains unexhausted and the state courts would now deem it procedurally barred. *See, e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 735 n.* (1991); *see also Medlock v. Ward*, 200 F.3d 1314, 1323 (10th Cir.) (recognizing as adequate and independent Oklahoma's procedural bar applicable to ineffective-assistance claims petitioner failed to raise in initial state post-conviction proceedings), *cert. denied*, 121 S. Ct. 197 (2000). As such, this

ineffective-assistance claim cannot provide cause excusing Johnson's default. *See Edwards v. Carpenter*, 529 U.S. 446, 120 S. Ct. 1587, 1591-92 (2000). He fails to offer any further cause excusing the default of this ineffective-assistance claim. *See id.* at 1592. Nor does he allege his actual innocence, such that he would meet the fundamental miscarriage of justice exception to his default. *See, e.g.*, *Schlup v. Delo*, 513 U.S. 298, 321 (1995).

Even if we did address this claim's merit, however, it would not warrant habeas relief. Defense counsel exercised a peremptory challenge to remove Whitely. She, therefore, did not sit on Johnson's jury. The loss of that peremptory challenge alone is insufficient to establish a constitutional deprivation. *See Ross v. Oklahoma*, 487 U.S. 81, 88 (1988). Rather, this claim fails because Johnson is unable to show that the twelve jurors who did sit on his jury were other than fair and impartial. *See id.* at 85-86, 88.

**B.   *Failure to excuse two jurors who indicated Johnson should testify if he was innocent.*** Johnson also challenges the trial court's refusal to remove for cause prospective jurors Miller-Reed and Robertson, who indicated during voir dire that if Johnson was innocent, he should waive his Fifth Amendment privilege and testify. Because Johnson exercised a peremptory challenge to remove Miller-Reed, any error in failing to remove her for cause would again not amount to a constitutional violation. *See id.* at 88. Rather, the sole question here

- 6 -

is whether Juror Robertson, who did sit on Johnson's jury, was impartial. *See id.* at 85-86, 88.

Although Robertson did express her belief that Johnson should testify if he was innocent, the trial court later explained in detail Johnson's Fifth Amendment privilege not to testify and the importance of that right. Juror Robertson then stated she understood and that she would follow the court's instructions to the best of her ability.

In refusing to excuse Robertson for cause, the trial court found that she would be impartial. That is a factual finding, *see Patton v. Yount*, 467 U.S. 1025, 1036 (1984), which we presume correct, absent clear and convincing evidence to the contrary, *see* 28 U.S.C. § 2254(e)(1). *See also, e.g., Battenfield v. Gibson*, 236 F.3d 1215, 1224 n.3 (10th Cir. 2001). Further, we afford special deference to the trial court's finding because it turns on the juror's credibility and demeanor, matters which the trial court is in the best position to assess. *See Patton*, 467 U.S. at 1037 n.12, 1038-40, 1038 n.14; *see also, e.g., Wainwright v. Witt*, 469 U.S. 412, 424-26 (1985).

Here, although Juror Robertson's voir dire answers were equivocal, the trial court, aided by its assessment of her demeanor and credibility, could properly resolve any ambiguity in favor of the State. *See Witt*, 469 U.S. at 434-35 (pre-AEDPA case; presuming correctness of state trial court's factual finding

concerning juror's bias, despite any ambiguity in juror's responses, in light of trial court's assessment of juror's demeanor); *see also Moore v. Gibson*, 195 F.3d 1152, 1170 (10th Cir. 1999), *cert. denied*, 120 S. Ct. 2206 (2000). Johnson has failed to rebut, by clear and convincing evidence, the trial court's finding that Juror Robertson could "lay aside [her] opinion and render a verdict based on the evidence presented." *Yount*, 467 U.S. at 1037 n.12; *cf. United States v. Bedonie*, 913 F.2d 782, 797-98 (10th Cir. 1990) (affirming, on direct appeal, trial court's finding that juror was impartial, despite juror's beliefs that anyone charged with crime was guilty to some extent, and if a defendant was guilty, he should so plead and forego trial, where juror also subsequently indicated he had formed no opinion as to this particular defendant, he would be willing to base his verdict entirely on evidence heard at trial, and he would be "as fair as [he] could be").

Johnson contends the district court should have held an evidentiary hearing to permit him to prove Juror Robertson's bias. Johnson unsuccessfully sought a state court post-conviction evidentiary hearing, although apparently not on this issue. Even assuming that 28 U.S.C. § 2254(e)(2) would not now preclude a federal evidentiary hearing, *see Mayes v. Gibson*, 210 F.3d 1284, 1287 n.2 (10th Cir.), *cert. denied*, 121 S. Ct. 586 (2000), Johnson would be entitled to a hearing only "if his allegations, if true and not contravened by the record, would entitle him to habeas relief." *Id.* at 1287. The voir dire record, however, does

contravene Johnson's allegations that Juror Robertson was biased. In addition, Johnson fails to indicate what evidence he could now assert, beyond the trial court's voir dire, to prove bias. *See Boyd v. Ward*, 179 F.3d 904, 925 (10th Cir. 1999), *cert. denied*, 120 S. Ct. 1188 (2000). The district court, therefore, did not err in denying Johnson a hearing.

    *C.* **Caldwell** [1] *violation.* During voir dire, the trial court asked, on a number of occasions, whether, if prospective jurors found the law and evidence warranted the recommendation of a death sentence, they could vote to recommend that penalty. Johnson argues the trial court's use of "recommend" improperly diminished the jury's sense of responsibility for imposing a death sentence, contrary to *Caldwell*. *See also Romano v. Oklahoma*, 512 U.S. 1, 8-9 (1994). He further asserts that the jury's later query, during its deliberations, as to the availability of parole under a life-without-parole sentence, aggravated this improper use of the term "recommend" during voir dire.

    The Oklahoma Court of Criminal Appeals rejected these arguments, in light of the trial court's instructions to the jury during sentencing. *See Johnson*, 928 P.2d at 314. The state appellate court further held that the jury's inquiry, during its deliberations, did not change the *Caldwell* analysis. *See id.* Although we resolve the jury's inquiry in a different manner, we agree that it does not change

---

[1]     *Caldwell v. Mississippi*, 472 U.S. 320 (1985) (plurality).

the *Caldwell* analysis.

To violate *Caldwell*, remarks to the jury must inaccurately describe the role of the jury as provided by state law. *See, e.g., Romano*, 512 U.S. at 9. Oklahoma law does specifically refer to a capital jury's sentencing determination as a "recommendation." Okla. Stat. tit. 21, § 701.11; *see, e.g., Humphreys v. State*, 947 P.2d 565, 570 (Okla. Crim. App. 1997) (holding it was proper statement of Oklahoma law to inform venirepersons that, upon conviction, it would be their duty to determine whether to recommend death); *see also, e.g., Gilson v. State*, 8 P.3d 883, 895 (Okla. Crim. App. 2000) (noting trial court sentenced capital defendant to death according to jury's recommendation); *Bland v. State*, 4 P.3d 702, 709 (Okla. Crim. App. 2000) (same), *cert. denied*, 2001 WL 12990 (U.S. Jan. 8, 2001) (No. 00-7222).

Moreover, the challenged remarks must be considered in light of the trial as a whole. *See Walker v. Gibson*, 228 F.3d 1217, 1243 (10th Cir. 2000); *Moore*, 195 F.3d at 1174. Here, the prosecutor's second-stage opening and closing arguments did not attempt to diminish the jury's responsibility for the sentencing decision and defense counsel's argument reiterated that sentencing was the jury's decision alone. The jury instructions also made clear that it was the jurors' "duty to determine the penalty to be imposed," Trial tr. vol. IV at 720; *see Romano*, 512 U.S. at 9; *Walker*, 228 F.3d at 1243; *Moore*, 195 F.3d at 1174, and did not

use any derivation of the term "recommend." In light of the entire record, the state appellate court's determination was not contrary to, nor an unreasonable application of, *Caldwell*. *See* 28 U.S.C. § 2254(d)(1).

**II.** ***Jury instructions.*** Johnson challenges several first-stage jury instructions. He bases these challenges on his defense that, while he was present at the time of the murder and did hit the victim in the head with a baseball bat, it was Masquat who actually killed the victim by pouring gas on him and setting him on fire.

    **A.** ***Aiding and abetting jury instruction.*** Due process requires the State to prove beyond a reasonable doubt each element of the charged offense. *See In re Winship*, 397 U.S. 358, 364 (1970). In addition, in order to constitutionally impose a death sentence, under *Enmund v. Florida*, 458 U.S. 782, 797 (1982) and *Tison v. Arizona*, 481 U.S. 137, 157-58 (1987), the State must prove that the petitioner himself killed or attempted to kill the victim, intended that a killing take place or that lethal force be employed; or that the petitioner was a major participant in the felony underlying a felony murder conviction and acted with reckless indifference to human life. *See, e.g., Fox v. Ward*, 200 F.3d 1286, 1294 (10th Cir.), *cert. denied*, 121 S. Ct. 329 (2000); *United States v. McVeigh*, 153 F.3d 1166, 1195 (10th Cir. 1998).

    The jury convicted Johnson of malice aforethought, rather than felony,

murder. Johnson, nonetheless, argues that, because the first-stage instructions relieved the State of its burden of proving beyond a reasonable doubt that he possessed the requisite intent to commit malice murder, he is entitled to habeas relief from both his conviction and death sentence. In particular, he challenges instruction No. 9, permitting the jury to convict Johnson either because he committed the murder or because he knowingly aided and abetted Masquat's commission of malice murder, with "a design to commit a crime or to commit acts the probable consequences of which are criminal." Johnson contends this instruction permitted the jury to convict him of first degree murder if it found that he possessed only a general criminal intent, rather than the specific intent to kill Webb.

The Oklahoma Court of Criminal Appeals held the jury instructions, considered as a whole, properly instructed jurors that they had to find that Johnson acted with "malice aforethought" before they could convict him of first degree murder. *See Johnson*, 928 P.2d at 316; *see also id.* at 319 (rejecting *Enmund/Tison* claim). That determination was not contrary to, nor an unreasonable application of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1).

The criminal information, read to the jury, charged Johnson with acting in concert with Masquat and "with premeditated design to effect" Webb's death.

Instruction No. 1. The trial court further instructed the jury that, in order to convict, it had to find four elements, including that Webb's "death was caused with malice aforethought," Instruction No. 16, defined as the "deliberate intention to take away" another's life, Instruction No. 17. Additionally, the trial court specifically instructed jurors that the State had to prove beyond a reasonable doubt that Johnson "formed the specific criminal intent of malice aforethought." Instruction No. 11.

It was within this context that the trial court further instructed jurors that [a] person concerned in the commission of a crime as a principal is one who directly and actively commits the acts constituting the offense, knowingly and with criminal intent aids and abets in the commission of the offense whether present or not, or advises and encourages the commission of the offense[; and that o]ne who does not actively commit the offense, but who aids, promotes, or encourages its commission, either by act or counsel or both, is not deemed to be a principal to the crime unless he did what he did knowingly and with criminal intent. To aid or abet another in the commission of a crime implies a consciousness of guilt in instigating, encouraging, promoting, or aiding in the commission of that criminal offense.

- 13 -

Instruction Nos. 7 and 8.

These instructions, as a whole, clearly tie the aiding and abetting instruction to the specific intent to kill Webb. *See Andrews v. Shulsen*, 802 F.2d 1256, 1274 (10th Cir. 1986) (upholding instruction indicating jury could convict defendant of intentional murder under Utah law for, among other things, intentionally rendering advice during the murder or intentionally helping the murderer escape after the killing, neither of which referred to the necessary intent to kill, where other instructions did require jury to find intent to kill).

Further, the record is sufficient to support the jury's finding that Johnson did act with the intent to kill. *See id.* at 1274-75. Webb identified Johnson as the one who hit him with a baseball bat, and Johnson had Webb's blood on his shirt. Hitting Webb over the head with a baseball bat was part of a murder plan Johnson had accurately foretold in detail several days before the murder occurred. In addition, Johnson had previously made numerous statements about taking care of or getting rid of Webb. The jury instructions, therefore, read as a whole, required jurors to find that Johnson intended to kill Webb before they convicted Johnson of first degree malice murder.

> **B.      Causation instruction.**      The trial court instructed the jury that
> [n]o person may be convicted of      **MURDER IN THE FIRST**
> **DEGREE**  unless his conduct caused the death of the person

allegedly killed.  A death is caused by conduct if the conduct is a

substantial factor in bringing about the death and the conduct is

dangerous and threatens or destroys life.

Instruction No. 15.  Johnson challenges this causation instruction, relying on a

comment accompanying this state uniform instruction which "advises this

instruction is superfluous where," as here, "the defendant does not dispute the

cause of death but argues he is not the perpetrator."        *Johnson*, 928 P.2d at 316.

The Oklahoma Court of Criminal Appeals rejected this claim, holding that the

trial court properly, and simply out of an abundance of caution, gave this

causation instruction because the evidence supported a finding that both Masquat

and Johnson directly participated in the murder.        *See id.*  That determination was

not contrary to, nor an unreasonable application of, clearly established Supreme

Court authority.

To the extent Johnson is arguing that the trial court violated state law by

giving this instruction, he cannot state a federal habeas claim unless he can

establish that the erroneous instruction so tainted the trial as to deprive him of

due process.  *See, e.g., Estelle v. McGuire*  , 502 U.S. 62, 71-72 (1991).  It did not.

Johnson also argues that the causation instruction confused the jury, in light

of the trial court's further instruction on Johnson's voluntary intoxication defense.

- 15 -

Johnson contends that jurors might have improperly read these instructions together to permit them to convict Johnson of first degree malice murder simply because they may have believed his drinking could have been a substantial factor causing the murder, violating *In re Winship*, and to sentence him to death contrary to *Enmund* and *Tison*. Considered as a whole, however, there is no reasonable likelihood that the jury applied these instructions in a way that violated the Constitution. *See, e.g., McGuire*, 502 U.S. at 72. As discussed previously, the instructions, considered as a whole, clearly required jurors to find that Johnson had acted with the specific intent to kill Webb before they could convict him of first degree malice murder.

**III.  Trial court's response to jury's inquiry concerning meaning of sentence of life imprisonment without parole.** The trial court instructed the jury to consider its sentencing options of death, life imprisonment, and life imprisonment without the possibility of parole. During its deliberations, the jury inquired "We need to know! Is life without parole firm – Does it mean he can <u>never</u> be paroled [?]" Trial Court's Ex. #2 (emphasis in original). The trial court informed the jury that "[i]t is inappropriate for you to consider the question asked." Trial tr. vol. IV. Johnson asserts that the trial court's response violated *Simmons v. South Carolina*, 512 U.S. 154 (1994) (plurality), which "requires that a capital

- 16 -

defendant be permitted to inform his sentencing jury that he is parole ineligible if the prosecution argues," as it did here, "that he presents a future danger," *O'Dell v. Netherland*, 521 U.S. 151, 153 (1997).

**A.** ***Retroactive application of*** **Simmons**. As a threshold matter, the State argues that *Teague v. Lane*, 489 U.S. 288 (1989), bars the retroactive application of *Simmons* to this appeal. *Simmons* does set forth a new rule of law that cannot be used to disturb a death sentence that became final prior to that decision, issued June 17, 1994. *See O'Dell*, 521 U.S. at 153. Johnson's death sentence, however, did not become final until the Oklahoma Court of Criminal Appeals upheld his conviction and sentence on direct review, in August 1996, and the United States Supreme Court denied his petition for certiorari, on October 6, 1997. *See, e.g., Caspari v. Bohlen*, 510 U.S. 383, 390 (1994). Therefore, because Johnson's death sentence was not yet final at the time the Supreme Court decided *Simmons*, there is no retroactivity problem.

**B.** **Merits.** In *Simmons*, the trial court instructed the jury on its sentencing options of death or life imprisonment. *See* 512 U.S. at 158-60. Under applicable state law, however, the petitioner could never become eligible for parole. *See id.* at 158 n.2. The Supreme Court held that, where the State argues in a capital sentencing proceeding that the petitioner presents a future threat, due process requires that he be permitted to inform the jury that he is parole

- 17 -

ineligible.  *See O'Dell* , 521 U.S. at 153;  *Simmons* , 512 U.S. at 156.

In this case, on the other hand, the trial court instructed the jury on its three discrete sentencing options available under Oklahoma law--death, life imprisonment and life imprisonment without the possibility of parole.  We have held that instructing on these three options, without any further explanation, satisfies *Simmons* .  *See Mayes* , 210 F.3d at 1294.  Further, a trial court, in response to a jury's inquiry as to the meaning of a life sentence without parole, may simply refer the jury back to the instructions as given.  *See McGregor v. Gibson* , 219 F.3d 1245, 1256 (10th Cir. 2000),  *reh'g granted on other grounds* .  However, instead of simply referring the jury back to the court's original instructions, "the trial court told the jury it was not appropriate for it to consider whether the defendant could ' *never* be paroled.'"  *Johnson* , 928 P.2d at 320.

In Oklahoma, "the jury is not to be told of the inner workings of the parole system, even when it must compare two life sentences: one with the possibility of parole, and one without the possibility of parole."  *Id.*  This, however, does not obviate the need for a correct instruction concerning the three options, including life without parole.  *Simmons* , 512 U.S. at 166.  That a state may limit information given to juries about parole does not eliminate the need to inform the jury of parole ineligibilty where future dangerousness is at issue.  *Id.* at 168-69.

Although it did not specifically address  *Simmons* , the state appellate court

correctly held that the trial court's response was error because "the jury must consider the distinctions between life, life without parole and death as it reaches its sentencing decision." *Johnson*, 928 P.2d at 320. The state appellate court, however, deemed this error harmless beyond a reasonable doubt because the trial court's response was, in effect, "non-responsive" to the jury's inquiry and, as a result, had the effect of guiding jurors back to the plain language of the original instruction. *Id.*

It is not entirely clear whether the state appellate court applied *Simmons*. It did not cite *Simmons*, but rather *Mayes v. State*, 887 P.2d 1288, 1318-18 (Okla. Crim. App. 1994). However, it then applied the *Chapman v. California*, 386 U.S. 18, 24 (1967), harmless error test after concluding that the jury was misinstructed. *Johnson*, 928 P.2d at 320. This suggests that federal law including the substance of *Simmons* was applied. If so, we conclude that it was an unreasonable application of harmless error to the *Simmons* error, an error made more apparent by *Shafer v. South Carolina*, 121 S. Ct. 1263 (2001). *See* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 413 (2000). In the alternative, we would review the district court's legal conclusions on the *Simmons* issue de novo and reject them. The district court attempted to distinguish *Simmons* on several grounds, however, we are not persuaded given that *Simmons* rests upon eliminating a jury's misunderstanding so the jury will not perceive a "false

choice" between sentencing to death or a limited period of incarceration when future dangerousness is at issue. *Simmons*, 512 U.S. at 161-62.

In *Shafer*, the jury was instructed that "life imprisonment means until death of the offender," but the trial court, over defense objection, did not instruct "that a life sentence, if recommended by the jury, would be without parole." *Shafer*, 121 S. Ct. at 1269 (internal quotations omitted). Thereafter, the jury sent a note inquiring "'1) Is there any remote chance for someone convicted of murder to become elig [i]ble for parole?'" and "'2) Under what conditions would someone convicted of murder be elig[i]ble?'" *Id.* The trial court responded with "'Parole eligibility or ineligibility is not for your consideration." *Id.*

Although South Carolina maintained that *Simmons* did not apply, the Court extended *Simmons* to situations where the jury's choice is between life without parole and death, even if a third alternative encompassing release is available to the court. *Id.* at 1273. The Court held that "whenever future dangerousness is at issue in a capital sentencing proceeding under South Carolina's new scheme, due process requires that the jury be informed that the life sentence carries no possibility of parole." *Id.* The Court recognized that the jury was confused by the absence of such instruction as evidenced by its further question about parole eligibility, and firmly rejected the trial court's response that parole eligibility was not for the jury's consideration.

The jury's comprehension was hardly aided by the court's final instruction: "Parole eligibility or ineligibility is not for your consideration." That instruction did nothing to ensure that the jury *was* not misled and may well have been taken to mean "that parole *was* available but that the jury, for some unstated reason, should be blind to this fact."

*Id.* at 1274 (internal citations omitted) (emphasis in original). The "reality [of a life sentence without parole] was not conveyed to Shafer's jury by the court's instructions . . . ."

The same is true here. Contrary to the state appellate court's harmless error analysis, *Johnson*, 928 P.2d at 320, the trial court's instruction that it was inappropriate for the jury to consider parole eligibility did not refer the jury back to the instructions; rather, it plainly contradicted those instructions. The trial court did more than give a non-responsive answer–it told the jury that parole eligibility could not be considered when plainly it could be. At best, the jury had a conflict between the court's instructions as to whether it was proper to consider parole eligibility in imposing sentence. At worst, the jury may very well have thought that parole was available, even with the life without parole option, but for some unknown reason it could not consider that fact.

Harmless error is a mixed question of law and fact. *Hunt v. Oklahoma*, 683 F.2d 1305, 1309 (10th Cir. 1982). Given the need for heightened reliability in determining a capital sentence, we hold that the state appellate court's determination that the instruction was harmless error constitutes an unreasonable application of federal law. 28 U.S.C. § 2254(d)(1). To the extent that the state appellate court did not rely upon *Simmons*, we would conclude that the incorrect instruction "had substantial and injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993), and cannot be deemed harmless error. Under either approach, *see Bryson v. Ward*, 187 F.3d 1193, 1204-06 (10th Cir. 1999), the judgment of the United States District Court for the Eastern District of Oklahoma must be

REVERSED.

Johnson v. Gibson, 00-7008

**HENRY**, J., concurring.

The majority clearly explains the central dilemma in this case: that "the trial court's instruction that it was inappropriate for the jury to consider parole eligibility did not refer the jury back to the [original] instructions" but instead "plainly contradicted those instructions." Slip op. at 21. The majority then correctly applies the Supreme Court's decisions in Simmons v. South Carolina, 512 U.S. 154 (1994), and Shafer v. South Carolina, 121 S. Ct. 1263 (2001). I therefore join the majority opinion in full.

I write separately only to emphasize that the key to understanding Simmons – and therefore Shafer – is the concept of "false choice," that is, a choice that may be misleading to the jury. See slip op. at 19 (noting that "Simmons rests upon eliminating a jury's misunderstanding so the jury will not perceive a 'false choice'"). Notably, this court and several state jurists have made this very point in prior cases. See, e.g., Mayes v. Gibson, 210 F.3d 1284, 1294 (10th Cir. 2000) (concluding that there was no Simmons violation because "[n]o such false choice was created here" as in Simmons); Booker v. State, 773 So.2d 1079, 1097-98 (Fla. 2000) (noting that "the spirit of the United States Supreme Court's decision in Simmons v. South Carolina" is that "[t]his Court should not be a party to a process that affirmatively misleads a sentencing jury as to the true meaning and effect of the sentencing alternatives presented to it") (Anstead, J., concurring in

part and dissenting in part); State v. Shafer, 531 S.E.2d 524, 534 (S.C. 2000) (Finney, C.J., dissenting) (noting that "the overriding principle to be drawn from [Simmons] is that due process is violated when a jury's speculative misunderstanding about a capital defendant's parole eligibility is allowed to go uncorrected"), overruled by Shafer, 121 S. Ct. at 1263.

In Simmons, a plurality of the Court emphasized repeatedly the false choice confronting the jury in reaching its holding that, "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." Simmons, 512 U.S. at 156 (plurality opinion). For example, the plurality concluded its opinion by stating that "[t]he State may not create a *false dilemma* by advancing generalized arguments regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant will never be released on parole." Id. at 171 (plurality opinion) (emphasis added); see also id. at 161 (noting that, "[i]n this case, the jury reasonably may have believed that [the] petitioner could be released on parole if he were not executed"; adding that, "[t]o the extent this misunderstanding pervaded the jury's deliberations, it had the effect of creating a *false choice* between sentencing [the] petitioner to death and sentencing him to a limited period of incarceration") (plurality opinion) (emphasis added).

In <u>Shafer</u>, the concept of false choice was again highlighted – but this time by a majority of the Court. In its opinion, the majority explicitly stated that <u>Simmons</u>'s due process concerns arise when there are "'misunderstanding[s]' to avoid" or "'false choice[s]' to guard against." <u>Shafer</u>, 121 S. Ct. at 1272 (quoting <u>Simmons</u>, 512 U.S. at 161 (plurality opinion)). Because both <u>Simmons</u> and <u>Shafer</u> invoke false choice in reaching their respective conclusions, I believe that this court's inquiry into <u>Simmons</u> properly focuses on this concept.