2004 OK CR 25

**Mark David JOHNSON, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2003–351.**

Court of Criminal Appeals of Oklahoma.

July 19, 2004.

---

52. See *supra* note 9 for denying review upon issues not raised at nisi prius.

James C. Bowen, Silas R. Lyman, G.Lynn Burch, Attorneys at Law, Capital Trial Division, Oklahoma Indigent Defense System, Sapulpa, OK, attorneys for defendant at trial.

Charles J. Migliorino, Assistant District Attorney, Tishomingo, OK, Paule' Thrift Haggerty, Assistant District Attorney, Madill, OK, attorneys for the state at trial.

G. Lynn Burch, III, Capital Defense Counsel, Oklahoma Indigent Defense System, Norman, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Seth S. Branham, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## OPINION

CHAPEL, Judge.

¶ 1 On July 29, 1991, Mark David Johnson (along with codefendant Ricky Masquat) was charged with First Degree Murder in violation of 21 O.S.1991, § 701.1 in Love County District Court Case No. CRF–91–46. A Bill of Particulars was filed alleging two aggrava-

ting circumstances: 1) that the murder was especially heinous, atrocious and cruel and 2) the probability that Johnson would commit criminal acts of violence that would constitute a continuing societal threat.[1]  Finding both aggravating circumstances, the jury convicted Johnson and recommended death.  The Honorable John H. Scaggs, District judge, sentenced Johnson to death.  Johnson appealed.  On appeal, Johnson's conviction and sentence was affirmed.[2]  On October 6, 1997, the United States Supreme Court denied certiorari.[3]  On March 19, 1998, this Court denied Johnson's post-conviction relief application.[4]

¶ 2 On February 1, 1999, Johnson petitioned for federal habeas relief in the United States District Court for the Eastern District of Oklahoma.  After the petition was denied,[5] Johnson appealed to the Tenth Circuit Court of Appeals, which granted Johnson's petition and ordered that Johnson be resentenced.[6]

¶ 3 On April 1–4, 2002, Johnson was resentenced by jury and sentenced to death.  The jury found one aggravating circumstance: that the murder was especially heinous, atrocious or cruel.[7]  In accordance with the jury's recommendation, the Honorable John H. Scaggs again sentenced Johnson to death.  Johnson appeals this sentence.

¶ 4 On the evening of July 25, 1991, Mark Johnson, Ricky Masquat and Billy Webb left the Presidential Gardens apartment complex in Norman to go out and "party."  The men drove south on I–35, exited the interstate in Love County near Marietta, and drove to a rural spot on Putnam Road. According to Webb, they got out of the truck, Johnson then hit Webb in the head with a baseball bat

and Masquat poured gasoline on him and set him on fire.  Webb was discovered alive the next morning, standing naked and badly burned in the road.  Webb died approximately seventeen (17) hours after the attack.[8]

¶ 5 In Propositions I and V, Johnson claims that the trial judge and prosecutor impermissibly injected the possibility of commutation into the trial for the jury's consideration.  He is correct and entitled to a new sentencing hearing.

■ ¶ 6 At trial, Johnson called two Department of Correction employees, Emma Watts and Sharon McCoy, to testify regarding his exemplary behavior while incarcerated.  Johnson's counsel asked both if either were aware of anyone being released who had been sentenced to life imprisonment without the possibility of parole.  Both responded "No." The State did not object.  Thereafter, the prosecutor cross-examined McCoy with several questions about commutation and its meaning.  Taken cumulatively, McCoy's responses indicated the possibility that any inmate sentenced to death, life imprisonment without the possibility of parole, or life imprisonment might have their sentence commuted and thus be released from prison.  Johnson did not object to this testimony.[9]  On redirect examination, Johnson again asked McCoy if she knew of anyone serving life without parole who had been released from prison.  McCoy responded "No." In closing argument, the State argued that Johnson's sentence could be commuted, thus that he could be "let loose."  Again, Johnson failed to object.

---

1.  21 O.S.1991, § 701.12(4)(7).

2.  *Johnson v. State*, 1996 OK CR 36, 928 P.2d 309, 320.

3.  *Johnson v. Oklahoma*, 522 U.S. 832, 118 S.Ct. 99, 139 L.Ed.2d 54 (1997).

4.  *Johnson v. State*, No. PCD–97–339 (March 19, 1998) unpublished opinion.

5.  *Johnson v. Gibson*, Case No. CIV–98–331–S (E.D.Okla. Dec. 9, 1999).

6.  *Johnson v. Gibson*, 254 F.3d 1155 (10 th Cir. 2001).

7.  21 O.S.2001, § 701.12(4).  The jury rejected the aggravating circumstance alleging the probability that Johnson would commit criminal acts of violence that would constitute a continuing threat to society.

8.  This is a summary of facts detailed in *Johnson v. State*, 1996 OK CR 36, 928 P.2d 309.

9.  Johnson's attorneys later stated that they did not object to the "commutation" testimony because they did not want to "highlight" it.  (Sentencing transcript, pp. 5–9).

¶ 7 The jury retired to deliberate. After an hour and 15 minutes, they sent a note to the trial judge asking for a definition of "commutation." The trial judge returned them to the jury box and told them "commutation" was a "change of punishment from a greater to a lesser." The jury foreman replied that this did not answer their question and asked "will commutation be available for either one or all three sentences we're deciding on?" Both counsel for Johnson and the State approached the bench and objected to any further definition. The trial judge overruled the objections and informed the jury:

> In the entire criminal justice system ultimately the Executive could grant a commutation of a sentence—"executive" being the Governor. In order for that to occur it would take a hearing before the Pardon and Parole Board and a recommendation after a full and complete investigation by the Pardon and Parole Board to the Governor that they recommend a sentence be commuted. Even if that recommendation occurs the Governor is not obliged to grant a commutation of sentence. The question you have asked: Is it legally possible for any of the three sentences that you may consider for commutation by the Governor after favorable recommendation by the Pardon and Parole Board? Yes, it's possible. But the question is really, is it probable? And the answer to that question is: I don't know. My best—from my knowledge of sentencing in Oklahoma, from my knowledge of the Executive and the Par-

don and Parole Board's activities, I would—it is my estimation, and that's the best I can give you and I can't go into all kinds of detail because it's not appropriate, but the probability of it is unlikely from the experience that I've had as a Trial Judge with sentences that I've done and sentences that I've seen and information that I have. Yes, it's legally possible, legally probable unlikely.

¶ 8 The jury then resumed deliberations. Seven minutes later they informed the Court that they had reached a verdict.

■ ¶ 9 This Court has held repeatedly that evidence, argument, or instructions regarding Executive commutation cannot be presented to the jury.[10] Indeed, this Court recently reaffirmed this principle by cautioning that "[a]ny instruction attempted by the judicial branch [regarding commutation or parole], is doomed to inaccuracy. There is simply no clear answer to this type of question, and for that reason, none should be attempted." [11] Comments about commutation are prohibited as they inject speculation into sentencing, lead to death sentences due to juror fear of defendants' release, and undermine the jury's sense of responsibility for its sentencing decision.[12]

¶ 10 Despite this unequivocal prohibition, the State contends that Johnson invited and waived the error by "opening the door" to commutation by asking McCoy and Watts if they knew of anyone serving a life without parole sentence who had been released. This is a door that cannot be opened.[13]

---

**10.** Forty years of Oklahoma jurisprudence support the statement. *Mayes v. State,* 1994 OK CR 44, 887 P.2d 1288, 1318, *cert. denied,* 513 U.S. 1194, 115 S.Ct. 1260, 131 L.Ed.2d 140 (1995) (prohibiting the jury from hearing information regarding parole or commutation); *Tucker v. State,* 1972 OK CR 170, 499 P.2d 458, 461(error to instruct or comment to jury on parole or commutation); *Stokes v. State,* 1972 OK CR 113, 501 P.2d 864, 867 (same); *Cox v. State,* 1971 OK CR 486, 491 P.2d 357, 359 (instructions regarding commutation and pardon and parole policies are improper and prejudicial); *French v. State,* 1964 OK CR 125, 397 P.2d 909 (death sentence reversed where trial court responded to jury questions regarding parole possibilities for a defendant sentenced to life imprisonment); *California v. Ramos,* 463 U.S. 992, 1011, 103 S.Ct. 3446, 3458–59, 77 L.Ed.2d 1171 (1983)(States can decide whether instructions on Governor's commutation power can be presented to jury.)

**11.** *Harris v. State,* 2004 OK CR 1, 84 P.3d 731, 757. The instruction given in this case was a fairly accurate summary of current commutation process regarding the three sentencing options presented to Johnson's jury. The instruction did omit the requirement that the recommendation of the Pardon and Parole board to the Governor had to be by majority vote. Of course, these policies and principles could be changed at any time.

**12.** Blaine LeCesne, *Tipping the Scales toward Death: Instructing Capital Jurors on the Possibility of Executive Clemency;* 65 U.Cin.L.Rev. 1051, 1055 (1997).

**13.** *Harris,* 84 P.3d at 757(no information regarding parole or commutation should be given to the jury); *Mayes,* 887 P.2d at 1318 (refusing to allow information regarding parole or commutation

Commutation evidence, argument and instruction were all error.[14] They were also prejudicial in that they resulted in a denial of a fair and reliable sentencing hearing.

¶ 11 Before requesting the definition of commutation, the jury had deliberated for approximately one hour and fifteen minutes, finding one aggravating circumstance (heinous, atrocious and cruel) and rejecting the other (continuing threat). Despite having done so and presumably in mind of Johnson's mitigation evidence, the jury turned to the "commutation" question and asked the trial judge for instruction. The trial judge informed the jury that Johnson's sentence could be commuted under any of their three sentencing options, confirming their concern that he might be released back into the community. A mere seven minutes later, the jury informed the bailiff that they had reached a verdict. Clearly, their verdict, a sentence of death, was a direct result of the commutation evidence, argument and instruction. As a result, this Court must reverse and remand for resentencing.[15]

■ ¶ 12 In Proposition III, Johnson claims that he was denied his right to ask jurors whether they would automatically impose the death penalty. Johnson requested permission to ask this question in a pre-trial motion. Although the trial judge granted his request, he did not ask that specific question at trial and did not allow Johnson to do so when he tried.

¶ 13 This Court recently reiterated its repeated holding that when "a defendant so requests, either he or the trial judge must ask prospective jurors whether they would automatically impose a sentence of death."[16] There is simply no substitute for this specific question. General voir dire on the death penalty does not suffice.[17] Johnson's thwarted attempt to ask this question at trial, inexplicably denied,[18] was "constitutionally unacceptable."[19] This was also error.

¶ 14 We also address Proposition IV to aid in Johnson's resentencing. Johnson claims in Proposition IV that the trial judge erred in limiting his expert's testimony. Johnson called Barry Kinsey to rebut the continuing threat aggravator and present mitigating evidence. Dr. Kinsey presented expert testimony regarding risk assessment and the corresponding processes of "institutionalization" and "aging out." He elaborated: institutionalization is where an individual prefers incarceration to freedom. Aging out is where the probability of committing criminal activity decreases with age. However, Dr. Kinsey was not allowed to testify to Johnson's individualized risk assessment.

■ ¶ 15 Johnson tried to elicit this testimony, however, the trial judge refused to

---

because sentencing instructions self-explanatory and additional information regarding parole or commutation would serve to drown defendants downstream). This Court also recently held that the only information a jury may receive regarding parole is when the jury asks during deliberations if an "offender who is sentenced to life imprisonment without the possibility of parole is parole eligible[.] ... [Then,] the trial court should either refer the jury back to the instructions, ..., tell the jury that the punishment options are self explanatory, ..., or advise the jury that the punishment options are to be understood in their plain and literal sense and that the defendant will not be eligible for parole if sentenced to life imprisonment without the possibility of parole." *Littlejohn v. State*, 2004 OK CR 6, 85 P.3d 287.

14. As previously indicated, Johnson did not object to the testimonial evidence or the prosecutor's argument waiving all but plain error. He did object to the trial judge's commutation instructions.

15. Johnson also filed an Application for Evidentiary Hearing and Notice of Extra–Record Evidence regarding this claim. The Application is moot due to the relief ordered. Moreover, the Extra–Record Evidence was an improper attempt by Johnson to impeach the verdict with inappropriate Juror affidavit. 12 O.S.2001, § 2606 (prohibiting impeachment of verdict with internal matters during deliberations).

16. *Hanson v. State*, 2003 OK CR 12, 72 P.3d 40, 47.

17. *Hanson;* 72 P.3d at 47; (rejecting State's argument that *voir dire* taken as whole satisfied defendant's right to ask "automatic imposition" question).

18. *Id.*

19. *Id.;* OUJI–CR 2d as modified July 3 rd, 2003 (reiterating that when requested by a defendant either the defendant or trial court must ask the "automatic imposition" question).

allow it, finding a prohibition under *Davenport v. State*.[20] Johnson later reasserted his request to admit Dr. Kinsey's report and conclusions into evidence. The trial judge did not immediately deny the request but rather seemed willing to reconsider its previous ruling and allow the evidence. Before ruling on the new request, the trial judge asked Johnson's counsel if he was certain that he wanted the report admitted because it did state that if Johnson was released and if he abused alcohol or drugs, he would likely commit additional crimes. In response, Johnson withdrew the exhibit and his request for its admission. In so doing, he abandoned his request and waived this issue for review.[21] Nevertheless, a key issue must be resolved to provide guidance to trial courts presented with similar expert testimony.

■ ¶ 16 Any properly qualified expert[22] testifying in accordance with standards governing the admissibility of expert testimony may offer an opinion on the ultimate issue if it would assist the trier of fact.[23] The only limitation imposed by Davenport is that an expert cannot testify to an opinion that a witness is truthful or untruthful.[24] Had Johnson not withdrawn his request, and presuming that Dr. Kinsey's testimony was admissible,[25] he should have been allowed to testify to the results of Johnson's "risk assessment."[26]

## Decision

¶ 17 The Judgment and Sentence is **REVERSED and REMANDED** for resentencing.

**20.** 1991 OK CR 14, 806 P.2d 655.

**21.** *Kiser v. State*, 1989 OK CR 76, 782 P.2d 405, 408 (this Court will not consider position abandoned at trial on appeal).

**22.** *Hanson*, 72 P.3d at 52 fn. 36 (scientifically reliable expert testimony admissible).

**23.** 12 O.S.2001, § 704; *Hanson*, 72 P.3d at 51(expert testimony regarding a defendant's prison behavior admissible as mitigation to rebut continuing threat aggravating circumstance); *Fitzgerald v. State*, 2002 OK CR 31, 61 P.3d 901, cert. denied, 538 U.S. 951, 123 S.Ct. 1631, 155 L.Ed.2d 495 (2003) (defendant entitled to expert to rebut aggravating circumstances).

JOHNSON, P.J.: specially concur.

LILE, V.P.J. and LUMPKIN, J.: dissent.

STRUBHAR, J.: concur.

JOHNSON, P.J., Specially Concurring.

¶ 1 When the legislature changed the law to allow life imprisonment without the possibility of parole, it did so to give juries an option between two extremes—that is between death and life. A life sentence with the possibility of parole could be considered a short term of imprisonment for a very very serious crime. This third option seems to work well. But, if a jury believes or is lead to believe that life imprisonment without the possibility of parole does in fact not mean that a person would be incarcerated for the rest of his or her life, that third option is rendered meaningless. A jury is more likely to vote for the death penalty rather than life imprisonment to ensure the defendant never gets out of prison if the jury believes "without the possibility of parole" does not mean anything. Accordingly, jurors should not be advised about the inner workings of the Pardon and Parole Board or the power of the Governor as it relates to any form of clemency.

¶ 2 With this in mind, I address the issue in this case about who started the questions relating to credits and clemency. As noted above, clemency should never have been mentioned and when it was, the judge should have admonished the jury that that was beyond the jury's consideration. Such an admonishment should be given *sua sponte* when there is no objection. While lawyers

**24.** *Davenport*, 806 P.2d at 659.

**25.** *Hanson*, 72 P.3d at 52; (remanded in part to allow "risk assessment" expert to testify if scientifically reliable).

**26.** In addition to being admissible to rebut the continuing threat aggravating circumstance, Dr. Kinsey's opinion regarding Johnson's "risk assessment" is also admissible mitigating evidence. *Fitzgerald*, 61 P.3d at 901; (defining mitigating evidence as any evidence of defendant's record or character that could possibly convince a jury to give a sentence less than death).

are the first who should object when they consider a question or testimony to be out of line or objectionable, the trial judge also has the responsibility, even without objection, to monitor a death penalty case to see that prejudicial error does not occur. I believe a trial judge should *sua sponte* control this line of objectionable questioning.

¶ 3 The dissent claims the error in this case was invited by the defense, but that is not the way I read the record provided. The prosecutor was the first to bring up the matter of earned credits during his cross-examination of Department of Corrections employee Emma Watts. (Tr.III 556–557) On redirect, the defense attorney asked Watts whether a person serving life without parole got out of prison; Watts responded "No, you don't." (Tr.III 560).

¶ 4 I interpret this line of questioning relating to earned credits, which lead into questions concerning clemency, as beginning with the prosecutor's cross-examination of Watts. In response, defense counsel properly pointed out persons sentenced to life without the possibility of parole could earn credits but did not get out of jail.

¶ 5 Following Watts' testimony, the scenario worsened. Defense counsel, on direct examination, asked the next witness Sharon McCoy, "[i]f a man or woman is serving a sentence of life without parole they don't get out do they?" She responded, "No." The cross-examination of this witness was the coup de grace. The prosecutor asked McCoy if she was familiar with "the term commutation," asked what commutation was, who had the power to make that recommendation, and what prisoners were eligible for commutation. This line of questioning clearly revealed to the jury that commutation can happen even when a person is sentenced to life imprisonment without the possibility of parole. (Tr.III 568–572) Thus, by the prosecutor's questions, the jury was basically told a person who gets life imprisonment without the possibility of parole can still be released from prison.

¶ 6 In this case, neither the attorneys nor the trial judge acted appropriately when it allowed the jury to hear evidence relating to matters of credits, parole, and commutation.

The trial judge tried diligently to properly instruct the jury about matters of commutation, but this instruction likely improperly influenced the jury's decision to render a death sentence. This may be inferred from the short amount of time it took the jury to return a penalty of death after the trial judge's statements about commutation and clemency were put on the record. The trial judge's statements about the process were accurate but should not under any circumstances have been given to the jury. The prosecutors and defense counsel were seasoned attorneys and should never have put the trial court into the position they did.

¶ 7 I continue to firmly believe that juries should not be told of the inner workings of the Pardon and Parole Board, the power of the Governor to commute sentences, or other administrative executive matters which might affect a sentence of life without the possibility of parole. This is not information a jury needs. Approved uniform jury instructions give jurors the information they need to set punishment and those instructions should be followed.

¶ 8 Based upon the foregoing, I specially concur in the opinion of the majority.

LUMPKIN, J. dissents.

¶ 1 I continue to adhere to the rationale we enunciated in *Mayes v. State*, 887 P.2d 1288 (Okl.Cr.1994) of our long-standing policy of not instructing the jury in a criminal case on the exercise of executive clemency. I do so in that I view it as a shield to the defendant to ensure objective consideration of the sentencing options presented to the jury. However, when that shield is sought to be used as a sword, and response is invited, the rule is waived and the prosecution should be able to respond to ensure the jury is fully informed as to the truth regarding the sentencing options presented. For that reason I must dissent to the decision to reverse and remand this case once again for re-sentencing.

¶ 2 In pre-trial motions, the defense moved to allow evidence of the sentencing option of life without the possibility of parole. The trial judge put them on notice that evidence could lead to the jury receiving evidence

regarding the constitutional powers of the Governor to commute sentences. During the course of trial, the Assistant District Attorney inquired of Emma Watts, Unit Manager in Appellant's block, on cross-examination regarding credits Appellant earned and how those credits could be used. The defense failed to object to this entire line of questioning. Nothing was asked regarding commutation or life without parole. Then, upon direct examination of Ms. McCoy, Appellant's Case Manager on H Unit, the defense brought forward as their final question the following exchange; "Q: If a man or woman is serving a sentence of life without parole they don't get out, do they? A: No." (2002 Trial Tr. 567). During the cross-examination of Ms. McCoy, after discussing credits, the Assistant District Attorney then asked her if she was familiar with the term "commutation" and what it meant. She responded that since the Parole Board makes the recommendation, case managers are not involved with it anymore. Once again, no objection was made to this entire line of questioning.

¶ 3 Once the defense asked the question "if a man or woman is serving a sentence of life without parole they don't get out, do they?" and failing to object to any of the questions by the State regarding commutation, the evidence and issue was before the jury. There was no error, and if there was, it was invited.

¶ 4 *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) is not applicable to the facts of this case. In *Simmons,* the defendant was ineligible for parole under South Carolina law based upon his criminal record. However, the court rejected the defendant's request to inform the jury of that aspect of the state law. Instead, the court instructed the jury that they were not to consider pardon or parole eligibility and that the terms life imprisonment and death sentence were to be understood in their plain and ordinary meaning.

¶ 5 In *Ramdass v. Angelone,* 530 U.S. 156, 120 S.Ct. 2113, 147 L.Ed.2d 125 (2000), Justice Kennedy, writing for the majority, stated:

> *Simmons* created a workable rule. The parole-ineligibility instruction is required only when, assuming the jury fixes the

sentence at life, the defendant is ineligible for parole under state law.

530 U.S. at 166, 120 S.Ct. at 2120.

¶ 6 In *California v. Ramos,* 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), the U.S. Supreme Court held that specific jury instructions on executive clemency were constitutional, though states were equally free to withhold such information from the jury. Justice O'Connor wrote:

> Finally, we emphasize that informing the jury of the Governor's power to commute a sentence of life without possibility of parole was merely an accurate statement of a potential sentencing alternative. To describe the sentence as 'life imprisonment without possibility of parole' is simply inaccurate when, under state law, the Governor possesses authority to commute that sentence to a lesser sentence that includes the possibility of parole. The Briggs Instruction thus corrects a misconception and supplies the jury with accurate information for its deliberation in selecting an appropriate sentence.

463 U.S. at 1009, 103 S.Ct. at 3457–3458.

¶ 7 I do not advocate that Oklahoma go as far as California and adopt a jury instruction that informs the jury of the commutation process in every case. Only when the defense invites the full explanation of the constitutional clemency process should it be explained.

¶ 8 As we stated in *Mayes:*

> The reason a court is generally prohibited from mentioning parole lies not in any incentive to keep jurors ignorant of its existence, but rather because it is a discretionary procedure exercised by the executive branch which provides for a condition subsequent to the conviction and sentence after the party has been incarcerated in the state penitentiary. In other words it is offered as a reward in the form of commutation for good behavior of the inmate after he has been convicted. To have a judge tell a jury how long any particular inmate will serve after his conviction is asking him to see into the future. It would be both unrealistic and unwise to burden the already overworked trial

judges of our state with the responsibility of being soothsayers.

887 P.2d at 1318 (internal citations omitted).

¶ 9 This is still true and the basis upon which we should continue to forbid the admission of evidence regarding parole. However, when that evidence is admitted, without objection then the jury should be fully informed as to all aspects of the system, including the constitutional provisions regarding commutation.

¶ 10 Contrary to the majority's assertion, this Court has never held evidence of this type cannot be admitted, if invited. I find it of interest that in citing to 65 U.Cin.L.Rev.1051 (1997) [1] the majority fails to cite the last sentence of the article which states, "[c]ourts should employ a per se prohibition against any evidence, argument, or instruction on the governor's clemency powers **unless the defendant chooses to raise the issue.**" *Id.* at 1091 (emphasis added). It is a universally recognized principle in the law that invited error is not error and the opposing party has the right to respond. *See Hooper v. State,* 947 P.2d 1090, 1100, (Okl.Cr. 1997), *cert. denied,* 524 U.S. 943, 118 S.Ct. 2353, 141 L.Ed.2d 722 (1998), *Staggs v. State,* 719 P.2d 1297, 1299 (Okl.Cr.1986), *Goodrich v. State,* 553 P.2d 219, 222 (Okl.Cr.1976). That is what happened in this case.

¶ 11 Therefore, as Appellant injected the issue of commutation into the trial, the trial court properly instructed the jury on the issue. The jury instruction in this case is not grounds for reversal and remand for resentencing.

¶ 12 This brings us to the content of the instructions given by Judge Skaggs. A review of both instructions reveal that each was a true statement of the law of the State of Oklahoma and an accurate definition of terms in clear and concise language. An instruction on commutation is not contained in The Oklahoma Uniform Jury Instructions—Criminal (2d) (OUJI–CR). Pursuant to the order entered by this Court on April 4, 1996, adopting amendments to the second edition, trial

judges were directed, "[w]henever OUJI–CR does not contain an instruction on a subject on which the court determines that the jury should be instructed, the instruction given on that subject should be simple, brief, impartial and free from argument." Judge Skaggs followed that directive to the letter and provided the required guidance to the jury. Under the special facts of this case, there is no error either in the procedure or the instructions.

¶ 13 I also find error in the Court's discussion of the scope of opinion testimony by expert testimony. The recitation of the holding of *Davenport v. State,* 806 P.2d 655 (Okl. Cr.1991), is somewhat disingenuous. While in that particular case it is correct, the issue was the truthfulness of a child witness. However, as to the scope of testimony for an expert witness, this Court stated:

> Therefore, this Court accepts the accommodation syndrome as reliable scientific evidence provided that such syndrome is testified to by an expert that is (1) subject to cross-examination, (2) that the expert testifies as to the basis for such testimony, (the general acceptance in the scientific community and his knowledge of the syndrome), and (3) that the expert testifies only as to the background and nature of the syndrome and does not state an opinion as to whether or not the particular child suffers from the syndrome but leaves that to the jury.

806 P.2d at 660.

¶ 14 These guidelines regarding the methodology and scope of expert testimony comport with and follow ABA guidelines. *See Standard* 7–6.6, American Bar Association Criminal Justice Mental Health Standards. *See also White v. State,* 973 P.2d 306, 314 (Okl.Cr.1998) (Lumpkin, J: Specially Concur); *Hooks v. State,* 862 P.2d 1273, 1278–79 (Okl.Cr.1993), *cert. denied,* 511 U.S. 1100, 114 S.Ct. 1870, 128 L.Ed.2d 490 (1994); *Moore v. State,* 788 P.2d 387, 399 (Okl.Cr.), *cert. denied,* 498 U.S. 881, 111 S.Ct. 227, 112 L.Ed.2d 182 (1990). To paraphrase these cases, expert opinions should be barred from

1. Blaine LeCesne, Tipping the Scales Toward Death: Instructing Capital Jurors on the Possi- bility of Executive Clemency

admission when they merely tell the jury what result to reach. The role of the expert is merely to describe the factors relevant to a defendant's alleged particular condition. The jury will then apply the facts in evidence to those factors to determine if the condition/syndrome has been proven.

¶ 15 In this case the jury rejected the continuing threat aggravator and any evidence Dr. Kinsey could have given would only have gone to that issue. I do not find error in the trial judge's rulings based on *Davenport* and any perceived error by the failure of the defense to go forward with the witness based on those rulings is harmless due to the jury failing to find the continuing threat aggravator. However, it will continue to be an ongoing challenge for trial judges, as the gatekeepers under *Daubert*[2], *Kumho Tire*[3], and *Taylor*[4], to validate relevant experts and reliable science to determine admissibility of evidence in capital cases. I point this out for the sole reason it appears there has been a loss of focus as to why expert testimony is allowed in the trial of a case. Section 2702 of the Oklahoma Evidence Code provides, "If scientific, technical or other specialized knowledge **will assist the trier of fact to understand the evidence or to determine a fact in issue,** a witness

qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" (emphasis added). As the Evidence Code specifically points out, the experts are not the evidence but collateral to the evidence already presented. However, it appears in the areas of sociology and psychology the reverse is true, and it is in direct conflict with § 2702 of the Evidence Code and Standard 7–6.6 of the ABA Criminal Justice Mental Health Standards. It is for that reason I question the admissibility of Dr. Kinsey's testimony in the first place. Granted, due to the limited record it is difficult to determine what the scope of that testimony would have been. Regardless, based on this record, I find no error, and would affirm the judgment and sentence.

¶ 16 I am authorized to state Judge LILE joins in this dissent.

**2.** 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**3.** 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

**4.** 889 P.2d 319 (Okl.Cr.1995).