*904 HENRY, Circuit Judge.
Lloyd Edward Mollett was found guilty of first-degree murder and first-degree rape by an Oklahoma jury. At the trial’s sentencing stage, the prosecution urged the jury to impose the death penalty. During the jury deliberations that followed, the jury sent the presiding judge a note asking the judge to “tell us if we find a sentence of [l]ife is the[re] any possibility of Mr. Mollett ever leaving prison for any reason whatsoever.” The trial judge replied that “Matters of parole are beyond the purvue [sic] of the jury or the court to consider.” The judge did not advise defense counsel or the prosecution of the question or his response. The jury later sentenced Mr. Mollett to death.
The Oklahoma Court of Criminal Appeals affirmed the convictions and sentences and, later, denied post-conviction relief. Subsequently, the United States District Court for the Western District of Oklahoma conditionally granted Mr. Mol-lett habeas relief, finding that Mr. Mollett is entitled to a new sentencing hearing on the grounds that (1) the trial court’s reply to the jury denied Mr. Mollett due process under Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), and (2) Mr. Mollett’s trial counsel provided ineffective assistance of counsel during the trial’s sentencing phase by failing to investigate and present mitigating evidence. As detailed below, we affirm on the Simmons due process issue and therefore do not reach the issue of ineffective assistance of counsel.
I. BACKGROUND
This tragic case arises out of Mr. Mol-lett’s rape and murder of Sri Sedjati Su-geng. In 1993, Mr. Mollett and Ms. Su-geng lived in the same apartment complex in Stillwater, Oklahoma. Mr. Mollett lived with his girlfriend and her son; although he suffered from visual impairment, learning disability, and Attention Deficit Disorder, he was able to work at a printing press. Ms. Sugeng lived alone in the apartment complex; she had moved to the United States from Indonesia to attend Oklahoma State University, where she was studying interior design. During this time, Mr. Mollett and Ms. Sugeng became somewhat acquainted. The two owned Rottweiler dogs and would sometimes chat as they walked their dogs.
On the evening of October 22, 1993, Ms. Sugeng had plans to meet two friends for a movie. When Ms. Sugeng did not appear at the movie theater, her friends repeatedly attempted to telephone her and then went to her apartment. There, Ms. Su-geng’s friends found her face down in the bathtub, unconscious. The attempts to resuscitate Ms. Sugeng were unsuccessful, and she died.
A subsequent investigation of Ms. Su-geng’s apartment revealed, among other things, two blood stains on the living room floor. Near those blood stains was a baseball cap in which hairs were subsequently found. A pair of torn pink undergarments was found near Ms. Sugeng’s bed, and bloodstains were found on her bed.
The baseball cap found in Ms. Sugeng’s apartment was later traced to Mr. Mollett, who admitted that the cap was his. The bloodstains in the living room were identified as Ms. Sugeng’s blood. The stain on the bed contained both Ms. Sugeng’s blood and Mr. Mollett’s semen. Mr. Mollett’s semen was also detected on the vaginal swabs later taken by the medical examiner. A medical examiner examined Ms. Sugeng’s body and found contusions and bruises on her cheek and under her chin and inner lips, a contusion on her chest, bruising on her hips, and lacerations both inside and just outside Ms. Sugeng’s vagi *905 na. Injuries consistent with defensive wounds were found on Ms. Sugeng’s hands, wrists, and forearms. Further, marks on Ms. Sugeng’s throat, in conjunction with petechial hemorrhaging, indicated that she had been strangled. Ms. Su-geng’s lungs and trachea were filled with fluid in a manner associated with drowning. The medical examiner ultimately concluded the cause of death to be asphyxia from either drowning or neck compression.
Mr. Mollett was arrested shortly thereafter and in 1995, he was tried by a Payne County, Oklahoma jury. After the jury convicted Mr. Mollett of rape and first-degree murder, the State sought the death penalty, arguing that three of the aggravating factors that can trigger the imposition of the death penalty under Oklahoma law were present: (1) that the murder was “especially heinous, atrocious or cruel;” (2) that Mr. Mollett committed the murder “to avoid lawful arrest or prosecution;” and (3) that Mr. Mollett was a “continuing threat to society.” Okla. Stat. tit. 21, § 701.12.
Oklahoma law provides for three possibilities when a defendant is charged with a crime for which the prosecution seeks the death penalty. First, if the prosecution proves that a statutory aggravator is present, and the jury does not find that mitigating evidence outweighs the aggravator, the death penalty may be imposed. See Okla. Stat. tit. 21, § 701.11. Second and third, the jury, or, absent agreement between among the jurors, the trial judge, may “impose a sentence of [either] imprisonment for life without parole or imprisonment for life.” Id. (emphasis supplied).
Approximately one month before Mr. Mollett’s trial, Mr. Mollett’s trial counsel requested that the jury be instructed under Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994):
that [opinion] addresses life in prison without parole .... it stands for the proposition that there is a chance that a jury may believe it does not really mean life without parole. And we would request they be instructed on that issue. But I would like to put the Court on notice by virtue of Simmons.
Tr. of Dec. 6, 1999 Proceedings, at 8. Mr. Mollett’s trial counsel followed that request with a written request that the court instruct the jury that:
when considering punishment that life imprisonment means imprisonment for life. You are further instructed that the death penalty means that the Defendant will be put to death. You are also instructed that life without parole means that the Defendant will be in the penitentiary for all of his life with no possibility of parole. You should draw no other conclusions concerning punishment other than what is stated in this instruction.
State Ct. Rec. vol. III, at 464 (Defendant’s Requested Second Stage Jury Instructions filed Jan. 19, 1995).
The district court did not agree to the requested jury instruction. At the trial’s sentencing stage, the State introduced evidence of Mr. Mollett’s three prior felony convictions. Additionally, the State incorporated all guilt-stage evidence and presented victim-impact evidence from Ms. Sugeng’s family. At the sentencing hearing, Mr. Mollett presented seven mitigation witnesses who testified to a variety of mitigating circumstances, including his health problems and also to various qualities of Mr. Mollett, such as that he is a good person who is loved, loving, helpful, thoughtful, generous, hard-working, kind, an animal lover, and non-violent.
After the conclusion of the presentation of evidence in the trial’s sentencing stage, the trial judge instructed the jury. Over *906 the objection of Mr. Mollett’s counsel, the trial judge instructed that “[t]he crime of Murder in the First Degree is punishable by death or by imprisonment for life without parole, or by imprisonment for life.” Id. at 441. No further definition of any of the sentencing options was given to the jury. See id. at 439-51.
During closing arguments, the prosecutor repeatedly stressed that the jury should find that Mr. Mollett constituted a continuing threat to society:
The State has alleged that this defendant is a continuing threat to society. He always will be [a continuing threat] is what the evidence establishes: .... Look at the nature of the crime itself when determining whether continuing threat exists, and the circumstances surrounding the entire picture of these crimes.
He stalked her. This was not a crime of rage committed in a heat of the moment. This was a crime of design, or premeditation, and of planning. The evidence was revealed that Mr. Mollett had copies of the pass keys to Forty North apartments. [Ms. Sugeng] would not have been safe from him even behind locked doors. And [Ms. Sugeng] ... is no different from the rest of us.... Look at the severity of the injuries, the callous and brutal nature of the crime itself.
We have a torn vagina and hymen which we know a knife did not cause. We know there are two books of a sexual nature in that apartment. And according to the friends who have discussed more with [Ms. Sugeng] than her dog and the weather, they did not belong to her.
Because of the extent of the vaginal wounds one could reasonably infer that her assault involved repeated acts of rape and penetration. This was a rape of degradation, humiliation, and intense pain designed to punish her for refusing his attentions and rejecting his offers.
Let’s examine more of the evidence to see the callousness of this crime before you. All evidence from the first stage has been introduced into this stage, including the testimony of the defendant himself. Usually in your experience have you not found that even in a lie there are tidbits and moments of truth, those things that reveal how a person’s mind works?
Examine the terms the defendant used when describing his relationship and actions with [Ms. Sugeng.] I hit on her, we just got it on, I put her back and her butt on the bed with her legs up in the air.
These are not terms of respect of another human being. They are not describing a caring relationship. He had no regard for her as a person or her left behind body. The defendant testified in cross examination that he knew [Ms. Sugeng’s] family was coming to see her that weekend. He chose Friday to murder her. He left her in a tub dumped. That is callous.
Look at the scenario of what happened in that apartment that evening. We go from bedroom to living room to bathroom. She couldn’t get away from him. She tried as she ran bleeding into the living room. When he took her into the bathroom there might have been hope in her mind that maybe, maybe he’s just trying to wash the evidence away and he’ll leave.
But hope was not there for [Ms. Su-geng]. He strangled her, he pushed her mouth under the water, and water was all she could breathe until she could breathe no more. And that’s where he left her. And that’s callous.
*907 The defendant never would admit during his testimony on cross that he was in the bathroom that evening. Obviously the evidence suggests otherwise. And as [Ms. Sugeng] lay dead or dying in the tub the defendant picked up a towel to clean his genitals, [Ms. Sugeng’s] blood from him, throws it onto the floor, turns off the light, — remember it’s the only light in the apartment off — goes home to wash the evidence way, discards his bloody jeans there, goes to [a friend’s] house where he lays down on the couch and watches TV.
That’s callous. That’s disregard for human life. That’s disrespect for the dead. That’s callous.
Even then he had a chance, an opportunity, a choice to prevent friends from walking into that death scene and finding a person they loved. He could have made anonymous calls to anybody, anyone but her family or friends so they didn’t have to find that. He chose not to. He covers up his crime all the way from setting it up beforehand to the thirteen pubic hairs he threw on the floor, to going back to Ron’s house, to telling the police never the truth. And that’s callous.
He has a criminal history that’s indicative of a progression of anti-social behavior. Receiving stolen property, concealing stolen property, burglary in the second degree. Those are felony offenses, Ladies and Gentlemen. They’re not minor crimes. They weren’t all committed at the same time. He wasn’t a child when he committed them.
He committed the first one and he was sentenced for it, and it did nothing. He committed more crimes. He committed the second one, he was sentenced for it, and that did nothing, and he went out and committed some more crimes.
He committed the third one, was convicted for it, and that did nothing. And now we’re here today in a rape and murder. It can’t get any more violent than this man has become.
Trial trans. vol. VII, at 66-71 (emphasis supplied). After trial counsel for Mr. Mollett completed his closing argument, the prosecution continued to argue, in rebuttal, that Petitioner constituted a continuing threat to society:
They say prison is good enough, he can’t get out. The people he meets there, the people he influences there, the people in contact with that mind there, they’ll come out. Not everyone in prison’s [sic] in there forever. And the cycle beings again.
The risk to society is too great. It’s said that locking up a person for the rest of his life is more cruel than executing him. That’s not so. For as long as an evilness in a mind survives it loves the wickedness. That’s what wickedness is.
They say Lloyd Mollett is not Ted Bundy and not Roger Dale Stafford. That they’re different. They’re killers. What made Bundy different than Lloyd Mollett is he was allowed to kill again until he finally received the death penalty.
Id. at 80-81 (emphasis supplied).
Following the closing arguments, the jury retired to deliberate concerning Mr. Mollett’s sentence. Sometime after deliberations began, the jury sent the judge a note which telegraphed the key issue in this appeal: “Judge can you tell us if we find a sentence of Life without parole is the[re] any possibility of Mr. Mollett ever leaving prison for any reason whatsoever”? Tr. Trans, vol. VII (note stapled to back cover of transcript). The parties agree that there is no indication of exactly when the note was sent. Unfortunately, the trial judge did not inform either side’s coun *908 sel of the note, nor did the trial court provide Mr. Mollett with an opportunity to demonstrate to the jury that he would be ineligible for parole under Oklahoma law. The trial judge did, as indicated previously, respond to the jury in writing that “[mjatters of parole are beyond the purvue [sic] of the jury or the court to consider.” Id.
Sometime following the receipt of the trial judge’s answer, the jury returned its verdict. The jury found the existence of two aggravating circumstances beyond a reasonable doubt — that the murder was especially heinous, atrocious or cruel; and that Mr. Mollett committed the murder to avoid lawful arrest or prosecution — but did not find that the prosecution had shown beyond a reasonable doubt that Mr. Mol-lett would be a continuing threat to society. The jury recommended that Mr. Mol-lett be sentenced to death plus seventy-five years’ imprisonment. Tr. Trans, vol. VII, at 85-86.
Mr. Mollett filed a direct appeal in the Oklahoma Court of Criminal Appeals raising fourteen propositions of error, including his claim that the trial judge’s answer to the jury’s question regarding the meaning of life imprisonment without parole violated his due process rights. The Oklahoma Court of Criminal Appeals affirmed, holding on the due process issue that “[although a jury may logically consider the possibility or absence of parole in determining the sentence a capital murder defendant is to receive, there is no requirement for a trial judge to explain the Oklahoma parole process to a jury,” Mollett v. State, 939 P.2d 1, 11 (Okla.Crim.App.1997) (internal citations and quotation marks omitted), and stating that “[t]he concept of parole is sufficiently clear to enable any rational juror to understand it without explaining it further. Consequently, we find no error.” Id. (internal quotation marks omitted). Two of the Oklahoma Court of Criminal Appeals judges disagreed, stating that they “believe [the trial judge] should provide a meaningful answer to questions from the jury when they ask, as they often do, about the meaning of life without parole.” Mollett, 989 P.2d at 15 (Chapel, J. and Strubhar, J., concurring).
Subsequently, after unsuccessfully petitioning for a writ of certiorari from both the Oklahoma Supreme Court and the United States Supreme Court and unsuccessfully seeking post-conviction relief in the Oklahoma Court of Criminal Appeals, Mr. Mollett sought habeas relief in federal district court, where he again argued that the trial court’s response to the jury’s question denied him due process.[1] Relying on this court’s application of Simmons in Johnson v. Gibson, 254 F.3d 1155, 1165-67 (10th Cir.), cert. denied, 534 U.S. 1029, 122 S.Ct. 566, 534 U.S. 1036, 122 S.Ct. 580 (2001), the district court held in a detailed memorandum opinion that the trial court’s response to the jury’s question violated Mr. Mollett’s due process rights because it did not refer to the original instructions and, instead, contradicted them by telling the jury that parole eligibility could not be considered when it could and should be, as parole eligibility was the only difference between life and life without parole. See Rec. vol. I, doc. 44 (Dist. Ct. Memorandum Op., dated Oct. 16, 2001). Thus, the district court found that the trial court’s answer to the jury’s question created a “false *909 dilemma,” thereby entitling Mr. Mollett to habeas relief under Simmons. Id. at 12. The State appeals.
II. DISCUSSION
A. Standard of Review
Because Mr. Mollett’s habeas petition was filed on November 2, 1998, after the effective date of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), AEDPA governs whether Mr. Mollett may obtain relief from his death sentence. Under AEDPA, because Mr. Mollett’s claim was adjudicated on the merits in state court, he is entitled to federal habeas relief only if he can establish that the state court decision was “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1). The Supreme Court recently stated that “[w]e have made clear that the ‘unreasonable application’ prong of § 2254(d)(1) permits a federal habeas court to ‘grant the writ if the state court identifies the correct governing legal principle from this Court’s decisions but unreasonably applies that principle to the facts’ of petitioner’s case.” Wiggins v. Smith, — U.S.-,--, 123 S.Ct. 2527, 2534-35, 156 L.Ed.2d 471 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 413, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). “In other words,” the Court stated, “a federal court may grant relief when a state court has misapplied a ‘governing legal principle’ to ‘a set of facts different from those of the case in which the principle was announced.’ ” Id. at 2535 (quoting Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144 (2003)).
B. Analysis
The State advances two arguments as to why the Oklahoma trial court’s response to the jury’s question concerning the meaning of life without parole was not contrary to clearly established federal law as determined by the Supreme. Court: (1) Simmons “does not apply to triple-option sentencing schemes like Oklahoma’s,” Aplt’s Br. at 16; and (2) even if Simmons applies to Oklahoma’s capital sentencing scheme, Simmons does not apply to this case because “[n]o such false choice arose in the instant case.” Aplt’s Br. at 20. We address each contention in turn.
1. Does Simmons apply to Oklahoma’s capital sentencing scheme?
In Johnson, 254 F.3d 1155, this court analyzed whether the instructions by the trial court in that case regarding Oklahoma’s capital punishment sentencing scheme violated Simmons or Simmons’ successor case, Shafer v. South Carolina, 532 U.S. 36, 121 S.Ct. 1263, 149 L.Ed.2d 178 (2001). The trial court in Johnson had instructed the jury on the three Oklahoma sentencing options. During deliberations, the jury asked whether life without parole meant the defendant could never be paroled, and the trial court responded that “ ‘[i]t is inappropriate for you to consider the question asked.’ ” Johnson, 254 F.3d at 1164.
We held in Johnson that the state trial court’s answer violated Simmons and Shafer, and therefore reversed the federal district court’s dismissal of the habeas petition. The majority opinion in Johnson recognized that Oklahoma law (permissibly) precludes instruction on the inner workings of the parole system, but noted that this preclusion “does not obviate the need for a correct instruction concerning the three options, including life without parole.” Johnson, 254 F.3d at 1165 (citing Simmons, 512 U.S. at 166, 114 S.Ct. 2187). “That a state may limit the information given to juries about parole,” we noted, *910 “does not eliminate the need to inform the jury of parole ineligibility where future dangerousness is at issue.” Id. (citing Simmons, 512 U.S. at 168-69, 114 S.Ct. 2187) (emphasis supplied).
The Oklahoma instructions at issue in this case are the same as those that were at issue in Johnson. See Johnson, 254 F.3d at 1165 (“In this case, the trial judge instructed the jury on its three discrete sentencing options available under Oklahoma law-death, life imprisonment[,] and life imprisonment without the possibility of parole.”). Nonetheless, the State argues that “this Court has not addressed the State’s assertion that Simmons is inapplicable to Oklahoma’s triple-option sentencing scheme.” Aplt’s Br. at 17.
We disagree. We did not in Johnson reserve the issue of the applicability of Simmons to Oklahoma’s sentencing scheme by assuming without deciding that Simmons applied; rather, a necessary logical predicate to our holding was that the trial judge’s instructions violated Simmons, and therefore, that Simmons applied. The State’s argument is therefore foreclosed by Johnson.
Moreover, even if the issue were an open one, we do not see why Simmons’ “false choice concern” should apply any less to Oklahoma’s sentencing scheme. As we recognized in Johnson, “Simmons rests upon eliminating a jury’s misunderstanding so the jury will not perceive a ‘false choice’ between sentencing to death or a limited period of incarceration when future dangerousness is at issue.” Id. at 1166. We also note that the Oklahoma Court of Criminal Appeals cited and distinguished Shafer and Johnson in Williams v. State, 31 P.3d 1046, 1050 (Okla.Crim.App.2001), noting that in Williams, unlike in Shafer and Johnson, “the jury was not presented with a ‘false choice’ as to its sentencing options.” (citing Johnson, 254 F.3d at 1167 (Henry, J., concurring)). As evidenced by the facts of Johnson and those of this case, this concern is no less potentially implicated by Oklahoma’s capital sentencing scheme than those of other states. Accordingly, we reject the State’s argument that Simmons is inapplicable to Oklahoma’s capital sentencing scheme.
2. Did the district court in this case create a “false choice” under Simmons in violation of Mr. Mollett’s due process rights?
Next, argues the State, even if Simmons does apply to Oklahoma’s capital sentencing scheme, Simmons does not apply because no “false choice” arose in this case. The State argues that because the jury in Mr. Mollett’s case did not find that the prosecution had proven that Mr. Mollett was a continuing threat to society, “Mr. Mollett is [therefore] not entitled to relief because unlike the juries in Simmons, Shafer, and Johnson, Mollett’s jury actually rejected a statutory aggravator requiring a finding that [Mr.] Mollett was a continuing threat to society.” Aplt’s Br. at 17.[2] The State’s view reflects an unjustifiably narrow reading of those three cases, which we now turn to discuss in some detail to illustrate this important point.
First, in Simmons, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133, the Supreme Court reviewed South Carolina’s capital sentencing scheme, which “ha[d] a life- *911 without-parole sentencing alternative to capital punishment for some or all convicted murderers but refuse[d] to inform sentencing juries of th[at] fact.” Id. at 168 n. 8, 114 S.Ct. 2187. However, the defendant in Simmons was parole ineligible under that scheme because of prior convictions for crimes of violence. See S.C. Stat. Ann. § 24-21-640; Simmons, 512 U.S. at 156, 114 S.Ct. 2187 (plurality opinion); id. at 176, 114 S.Ct. 2187 (O’Connor, J., concurring). The jury, in a note to the judge during sentencing deliberations, asked: “Does the imposition of a life sentence carry with it the possibility of parole?” Id. at 160, 114 S.Ct. 2187 (plurality opinion). Over defense counsel’s objection, the trial judge in Simmons instructed: “Do not consider parole or parole eligibility [in reaching your verdict]. That is not a proper issue for your consideration.” Id. After receiving this response from the court, the jury in Mr. Simmons’ trial returned a sentence of death, which Mr. Simmons unsuccessfully sought to overturn on appeal to the South Carolina Supreme Court. Id. at 160-61, 114 S.Ct. 2187.
A divided Supreme Court reversed the South Carolina Supreme Court. Justice Blackmun’s plurality opinion, joined by Justices Souter and Ginsburg, explained that the trial court had violated the defendant’s Fourteenth Amendment due process rights because “[t]he State may not create a false dilemma by advancing generalized arguments regarding the defendant’s future dangerousness, while, at the same time, preventing the jury from learning that the defendant never will be released on parole.” Id. at 171, 114 S.Ct. 2187 (emphasis supplied). The plurality noted that “[wjhile juries ordinarily áre presumed to follow the court’s instructions, we have recognized that in some circumstances the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.” Id. (internal quotations and citations omitted).
Similarly, Justice Souter, joined by Justice Stevens, concurred, stating that “juries in general are likely to misunderstand the meaning of the term ‘life imprisonment’ in a given context,” and that therefore “the judge must tell the jury what the term means, when the defendant so requests.” Id. at 174, 114 S.Ct. 2187 (Souter, J., concurring) (emphasis supplied). “It is, moreover, clear,” stated Justice Souter, “that at least one of these particular jurors did not understand the meaning of the term, since the jury sent a note to the judge asking, ‘Does the imposition of a life sentence carry with it the possibility of parole?’ The answer here was easy and controlled by state statute. The judge should have said no.” Id.
Justice O’Connor, joined by Chief Justice Rehnquist and Justice Kennedy, also concurred, holding that “[wjhere the State puts the defendant’s future dangerousness in issue, and the only available alternative sentence to death is life imprisonment without possibility of parole, due process entitles the defendant to inform the capital sentencing jury — by either argument or instruction — that he is parole ineligible.” 512 U.S. at 178, 114 S.Ct. 2187 (O’Connor, J., concurring) (emphasis supplied). In Simmons, “Justice O’Connor’s three Justice concurrence represented the narrowest grounds for a holding and, as such, represents the holding of the Court.” Smallwood v. Gibson, 191 F.3d 1257, 1280 n. 15 (10th Cir.1999).
The Court’s holding in Simmons via Justice O’Connor’s concurrence also relied in part on the concern about the judge’s *912 instructions creating a false choice articulated by the plurality:
The prosecutor in this case put petitioner’s future dangerousness in issue, but petitioner was not permitted to argue parole ineligibility to the capital sentencing jury. Although the trial judge instructed the jurors that “the terms life imprisonment and death sentence are to be understood in their pla[i]n and ordinary meaning,” I cannot agree with the court below that this instruction satisfied in substance petitioner’s request for a charge on parole ineligibility. The rejection of parole by many States (and the Federal Government) is a recent development that displaces the longstanding practice of parole availability, and common sense tells us that many jurors might not know whether a life sentence carries with it the possibility of parole. While it may come to pass that the “plain and ordinary meaning” of a life sentence is life without parole, that the jury in this case felt compelled to ask whether parole was available shows that the jurors did not know whether or not a life-sentenced defendant will be released from prison. Moreover, the prosecutor, by referring to a verdict of death as an act of “self-defense, ” strongly implied that petitioner would be let out eventually if the jury did not recommend a death sentence.
Simmons, 512 U.S. at 177-78, 114 S.Ct. 2187 (O’Connor, J., concurring) (emphasis supplied) (citations and select internal quotation marks omitted).[3]
Second, in Shafer, 532 U.S. at 40, 121 S.Ct. 1263, the Supreme Court clarified the application of Simmons to South Carolina’s capital sentencing scheme as amended by the South Carolina legislature in response to Simmons. Under the amended capital sentencing scheme, the jury first considered whether the State proved any aggravators beyond a reasonable doubt. See Shafer, 532 U.S. at 40, 121 S.Ct. 1263. If the jury did not find an aggravator, it did not make a sentencing recommendation, and the trial court would sentence the defendant to either life imprisonment or a mandatory minimum sentence. Id. at 40-41, 121 S.Ct. 1263. If the *913 jury, however, did find at least one aggra-vator, it would recommend a sentence of either death or life without parole. Id. at 41, 121 S.Ct. 1263. In Shafer, the jury had returned a death sentence after first being instructed that life imprisonment meant imprisonment until the defendant’s death and was later instructed by the court, in response to its questions, that it was not to consider parole eligibility. The defendant, however, actually was parole ineligible.
Reaffirming its holding in Simmons, the Court held “that whenever future dangerousness is at issue in a capital sentencing proceeding under South Carolina’s new scheme, due process requires that the jury be informed that a life sentence carries no possibility of parole.” Shafer, 532 U.S. at 51, 121 S.Ct. 1263 (emphasis supplied). In doing so, the majority emphasized that the jury’s comprehension was not aided by the trial court’s response to the jury’s question, and instead, the response misled the jury about the availability of parole, creating the potential for a false choice:
[WJhen the jury determines the existence of a statutory aggravator, a tightly circumscribed factual inquiry, none of Simmons’ due process concerns arise. There are no “misunderstanding[s]” to avoid, no “false choice[s]” to guard against. The jury, as aggravating circumstance factfinder, exercises no sentencing discretion itself.... It is only when the jury endeavors the moral judgment whether to impose the death penalty that parole eligibility may become critical. Correspondingly, it is only at that stage that Simmons comes into play, a stage at which South Carolina law provides no third choice, ... just death or life without parole.
Id. at 51, 121 S.Ct. 1263 (quoting Simmons, 512 U.S. at 161, 114 S.Ct. 2187) (emphasis supplied). The Court noted that the jury should be informed of the defendant’s parole ineligibility regardless of whether the jury or the trial court makes the ultimate sentencing decision. See id. at 51 n. 5, 121 S.Ct. 1263.
Third, this circuit’s decision in Johnson is relevant because, although not controlling, on-point “federal case law inferior to Supreme Court precedent, may serve as a guide in determining reasonableness of [a] state court’s application of Supreme Court law.” Bryson v. Ward, 187 F.3d 1193, 1205 (10th Cir.1999). In Johnson, both the majority and concurring opinions noted that “Simmons rests upon eliminating a jury’s misunderstanding so the jury will not perceive a ‘false choice’ between sentencing to death or a limited period of incarceration when future dangerousness is at issue.” Johnson, 254 F.3d at 1166; id. at 1167 (Henry, J., concurring) (stating that “the key to understanding Simmons — and therefore Shafer — is the concept of ‘false choice’, that is a choice that may be misleading to the jury,” and collecting opinions from multiple jurisdictions to that effect). Our holding relied in part on this concern about the potential for a false choice creating juror confusion:
[T]he trial court’s instruction that it was inappropriate for the jury to consider parole eligibility did not refer the jury back to the instructions; rather, it plainly contradicted those instructions. The trial court did more than give a non-responsive answer — it told the jury that parole eligibility could not be considered when plainly it could be. At best, the jury had a conflict between the court’s instructions as to whether it was proper to consider parole eligibility in imposing sentence. At worst, the jury may very well have thought that parole was available, even with the life without parole option, but for some unknown reason it could not consider that fact.
*914 Johnson, 254 F.3d at 1166 (emphasis supplied).
Turning to the State’s argument here, with these binding precedents in mind, we reject the State’s argument that no “false choice” under Simmons was created by the trial court in Mr. Mollett’s case. Under Simmons, a defendant’s due process rights are violated in cases like the instant one where: (1) the prosecution seeks the death penalty; (2) the prosecution places the defendant’s “future dangerousness ... at issue,” Shafer, 532 U.S. at 51, 121 S.Ct. 1263; (3) the jury asks for clarification of the meaning of “life imprisonment,” or a synonymous statutory term, Shafer, 532 U.S. at 45, 121 S.Ct. 1263; and (4) the judge’s response threatens to cause “a jury’s misunderstanding so the jury will ... perceive a ‘false choice’ of incarceration when future dangerousness is at issue.” Johnson, 254 F.3d at 1166; see also Shafer, 532 U.S. at 51, 121 S.Ct. 1263 (“Simmons’ due process concerns arise” if there are “ ‘misunderstanding^]’ to avoid, [or] ‘false choice[s]’ to guard against.”) (quoting Simmons, 512 U.S. at 161, 114 S.Ct. 2187).
Contrary to the State’s argument, nothing in these cases limits Simmons’ applicability to situations where the jury does not find a continuing threat aggravator to apply after the prosecution places the defendant’s future dangerousness at issue. See, e.g., Kelly v. South Carolina, 534 U.S. 246, 254 n. 4, 122 S.Ct. 726, 151 L.Ed.2d 670 (2002) (“The only questions in this case are whether the evidence presented and the argument made at [the defendant’s] trial placed future dangerousness at issue. The answer to each question is yes and we need go no further than Simmons in our discussion.”); cf Neill v. Gibson, 278 F.3d 1044, 1063 (10th Cir.2001) (“[The defendant] relies on Simmons v. South Carolina; that. decision concerned capital cases where a defendant’s future dangerousness is at issue. Here, however, the State did not charge [the defendant] with the continuing threat aggravator.”) (internal citation omitted).
Mr. Mollett satisfies each of the four elements. First, this is, of course, a capital case.
Second, the State placed future dangerousness at issue. This is so in several senses. Most obvious is that the State charged Mr. Mollett with the continuing threat aggravator. See Tr. Trans, vol. VII, at 66-71 (prosecutor’s closing argument). Thus, the “argument made at [Mr. Mollett’s] trial placed future dangerousness at issue.” Kelly, 534 U.S. at 254 n. 4, 122 S.Ct. 726.
Further, and more significantly, the prosecution’s arguments to the jury placed Mr. Mollett’s future dangerousness squarely at issue. The prosecution stated that “[t]he State has alleged that this defendant is a continuing threat to society. He always will be [a continuing threat] is what the evidence establishes.” Tr. Trans, vol. VII, at 66-67. In addition, the prosecution argued that Mr. Mollett “stalked” Ms. Sugeng. Id. at 67. The prosecution stated that “[Ms. Sugeng] would.not have been safe from [Mr. Mollett] even behind locked doors. And [Ms. Sugeng] is no different from the rest of us.” Id. Moreover, the prosecution argued that Mr. Mol-lett “has a criminal history that’s indicative of a progression of anti-social behavior. Receiving stolen property, concealing stolen property, burglary in the second degree. Those are felony offenses, Ladies and Gentlemen. They’re not minor crimes.” Id. at 70. Finally, the prosecutor proclaimed, speaking of Mr. Mollett, that “[i]t can’t get any more violent than this man has become.” Id. at 71.
From all this, it is evident that, “the evidence presented at [Mr. Mollett’s] trial *915 placed future dangerousness at issue.” Kelly, 534 U.S. at 254 n. 4, 122 S.Ct. 726. Indeed, in Kelly, the Supreme Court rejected the South Carolina Supreme Court’s characterization of the prosecutor’s closing argument, which discussed evidence that the defendant had been involved in previous attempted escapes from prison and that the defendant carried a shank, as merely “evidence as going only to Kelly’s likely behavior in prison, or to his proclivity to escape from it.” 534 U.S. at 253, 122 S.Ct. 726. Specifically, the Court noted:
The state court to be sure considered the prosecutor’s comparison of Kelly to a notorious serial killer, variously calling him a “dangerous” “bloody” “butcher.” The court nonetheless thought it could somehow cordon off these statements as raising nothing more than a call for retribution. But the import of the argument simply cannot be compartmentalized this way. Characterizations of . butchery did go to retribution, but that did not make them any the less arguments that Kelly would be dangerous down the road. They complemented the prosecutor’s submissions that Kelly was “more frightening than a serial killer,” and that “murderers will be murderers.” Thus was Kelly’s jury, like its predecessor in Simmons, invited to infer “that petitioner is a vicious predator who would pose a continuing threat to the community.”
Id. at 255-56, 122 S.Ct. 726 (internal citations and footnotes omitted) (emphasis supplied). The Court concluded that the prosecutor had indeed raised a “clear implication of future dangerousness” to the jury, id. at 255, 122 S.Ct. 726, and criticized the South Carolina “Supreme Court’s attempt to portray the thrust of the evidence as so unrealistically limited.” Id. at 254, 122 S.Ct. 726.
This case presents both the many references to evidence that Mr. Mollett was a continuing threat and the charge of the continuing threat aggravator; the facts thus demonstrate that the State placed Mr. Mollett’s future dangerousness at issue during his trial’s sentencing phase. The second Simmons element is therefore .satisfied.
The third element of a Simmons violation — whether the jury asks for clarification of the meaning of “life imprisonment,” or a synonymous statutory term, Shafer, 532 U.S. at 45, 121 S.Ct. 1263 — is also satisfied here. The jury asked for a definition of “life imprisonment” as used in Oída. Stat. tit. 21, § 711.11, by its written question to the trial judge: “Judge can you tell us if we find a sentence of Life without parole is the[re] any possibility of Mr. Mollett ever leaving prison for any reason whatsoever.” Tr. Trans, vol. VII (note stapled to back cover of transcript). “[T]hat the jury ... felt compelled to ask whether parole was available shows that the jurors did not know whether ... a life-sentenced defendant will be released from prison.” Simmons, 512 U.S. at 178, 114 S.Ct. 2187 (O’Connor, J., concurring); cf. Shafer, 532 U.S. at 53, 121 S.Ct. 1263 (stating that the “jury left no doubt about its failure to gain from defense counsel’s closing argument or the judge’s instructions any clear understanding of what a life sentence means”).
Fourth, the trial court’s supplemental instruction that “[mjatters of parole are beyond the purvue [sic] of the jury or the court to consider” threatened to cause “a jury’s misunderstanding” that the jury would “perceive a ‘false choice’ between sentencing to death or a limited period of incarceration when future dangerousness is at issue.” Johnson, 254 F.3d at 1166. The trial judge thus “did nothing to ensure that the jury was not misled,” and its *916 response “may well have been taken to mean ‘that parole was available but that the jury, for some unstated reason, should be blind to this fact.’ ” Shafer, 582 U.S. at 53, 121 S.Ct. 1263 (quoting Simmons, 512 U.S. at 170, 114 S.Ct. 2187)(plurality) (emphasis in original). Due to the trial court’s response, the jury was “left to speculate about petitioner’s parole eligibility when evaluating petitioner’s future dangerousness, and was denied a straight answer about petitioner’s parole eligibility even when it was requested.” Simmons, 512 U.S. at 165-66, 114 S.Ct. 2187 (plurality).
The trial court’s refusal to explain to the jury the distinguishing feature under Oklahoma law between life imprisonment and life imprisonment without parole, and its choice instead to affirmatively instruct the jury that parole was not to be considered, created serious potential for jury confusion on that question. The Supreme Court has warned that “accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die.” Gregg v. Georgia, 428 U.S. 153, 190, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality). Simmons, Shafer, and Johnson all reflect the importance of the jury being given access to accurate parole information when the prosecution places future dangerousness at issue. The trial court’s instruction that the jury not consider parole in this sense defeated the jury’s sentencing choice, which included the option of life imprisonment without parole, see Simmons, 512 U.S. at 167 n. 7, 114 S.Ct. 2187 (plurality) (noting that Oklahoma law allows a criminal jury in a first-degree murder “to specify whether the defendant should or should not be eligible for parole”), and therefore created the “false choice” prohibited by the Due Process Clause of the Constitution’s Fourteenth Amendment as interpreted by Simmons and its progeny. Mr. Mollett has satisfied the elements of a Simmons violation. We hold that the Oklahoma Court of Criminal Appeals’s rejection of Mr. Mol-lett’s due process claim was “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1).
3. The dissent’s application of Simmons
The dissent concludes that Simmons and Shafer do not apply to Oklahoma’s weighing-based death penalty scheme when, as here, the jury did not find a continuing threat aggravator. According to the dissent, Simmons and Shafer involve a non-weighing scheme in which the jury properly “exercises its unfettered moral judgment in determining whether the defendant should be sentenced to life imprisonment or death.” Dissent at 927. In contrast, under Oklahoma’s weighing-based scheme, if the jury finds the existence of one or more aggravating circumstances, the jury’s task is then “narrowly circumscribed to determining whether the aggravating circumstance(s) proved by the prosecution beyond a reasonable doubt outweigh the defendant’s evidence in mitigation.” Dissent at-(citing Okla. Stat. Ann. tit. 21, § 701.11; Irvin v. State, 617 P.2d 588, 598 (Okla.Crim.App.1980)). The dissent implies that, because the jury here did not find the continuing threat aggravator beyond a reasonable doubt, the prosecution’s allegations regarding Mr. Mollett’s future dangerousness were not relevant to the jury’s decision whether to impose the death penalty. As a result, the trial judge’s refusal to explain the sentencing option of life without parole did not present the jury with the “false choice” prohibited by Simmons.
For several reasons, the dissent’s logic is flawed. First and foremost, as emphasized above, there is no question that Sim- *917 mans and its progeny apply to Oklahoma’s scheme. See Johnson, 254 F.3d at 1166; Williams, 31 P.3d at 1050. The dissent also ignores the clear language of the Simmons line of cases that it is the prosecution’s placing the defendant’s future dangerousness at issue that potentially creates the “false choice.” See Kelly, 534 U.S. at 248, 122 S.Ct. 726 (“Last Term, we reiterated the holding of Simmons v. South Carolina, that when ‘a capital defendant’s future dangerousness is at issue, and the only sentencing alternative to death available to the jury is life imprisonment without possibility of parole, due process entitles the defendant to inform the jury of [his] parole ineligibility, either by a jury instruction or in arguments by counsel.’ ” (quoting Shafer, 532 U.S. at 39, 121 S.Ct. 1263)) (internal citations and quotation marks omitted); Johnson, 254 F.3d at 1166 (“Simmons rests upon eliminating a jury’s misunderstanding so the jury will not perceive a ‘false choice’ between sentencing to death or a limited period of incarceration when future dangerousness is at issue.”); Williams, 31 P.3d at 1050 (Oklahoma Court of Criminal Appeals’ recognizing that a “false choice” could be created if additional “instructions by the trial court ... conflict with the uniform instruction and confuse the jury as to the meaning of the available sentencing options”) (citing Shafer and Johnson). In Oklahoma, the Simmons protections are in play when false choices arise— namely when the prosecution places the matter at issue by charging the continuing threat aggravator and the trial court gives conflicting instructions in response to the jury’s inquiry regarding parole.[4] See Williams, 31 P.3d at 1050. Under South Carolina’s scheme, the Simmons protections are triggered when the prosecution places the matter at issue by referring to evidence of future dangerousness during trial. See Kelly, 534 U.S. at 254 n. 4, 122 S.Ct. 726.
Second, the dissent’s rigid division of the jury’s deliberations into an “eligibility step” and an “imposition step” misreads Simmons and Shafer. Dissent at 6-7. Although the jury here was required to determine the existence of the alleged aggravating factors before proceeding to the question of whether to impose the death penalty, the trial judge was neither required nor allowed to monitor those deliberations. Thus, when the jury asked about the meaning of life without parole, the judge did not know whether the jury was debating the existence of the continuing threat and other aggravators or whether it had proceeded to weighing aggravating and mitigating circumstances to determine if the death penalty was warranted. Regardless of the “step” of the jury’s deliberations, the judge’s response must not create a false choice dilemma. See Johnson, 254 F.3d at 1166. The dissent’s supposition that a Simmons violation can only occur during a discrete *918 “imposition step” of jury deliberations is unsupported by any case law, cf. Shafer, 532 U.S. at 51 n. 5, 121 S.Ct. 1263 (“If the jurors should be told life means no parole in the hypothesized bifurcated sentencing proceeding, they should be equally well informed in the actual uninterrupted proceeding”), and precludes the jury from revisiting earlier findings or beginning the deliberative process anew at any time. The judge’s response to the jury’s inquiry, just like, a juror’s change of heart, may shake views previously voiced. At all times during the collective process, without violating the jury instructions, jurors remain free to reconsider previous votes and express a change of mind. See United States v. Rastelli, 870 F.2d 822, 834 (2d Cir.1989) “[I]t is well established that the jury’s verdict is not final until the ‘deliberations are over, the result is announced in open court, and no dissent by a juror is registered.’ ” (quoting United States v. Taylor, 507 F.2d 166, 168 (5th Cir.1975)); Taylor, 507 F.2d at 168 (“Jurors are not bound by votes in the jury room and remain free to register dissent even after the verdict has been announced, though before the verdict is recorded.”); see also United States v. Chinchic, 655 F.2d 547, 549-50 (4th Cir.1981) (“Votes taken in the jury room prior to being returned in open court are merely preliminary and are not binding on the jury, any member of which is entitled to change his or her mind up until the time of the trial court’s acceptance of the verdict.”).
Third, the dissent’s contrast between the broad discretion of South Carolina’s juries and “the narrowly circumscribed” responsibilities of their Oklahoma counterparts “to determin[e] whether the aggravating circumstance(s) proved by the prosecution beyond a reasonable doubt outweigh the defendant’s evidence in mitigation,” is misguided. Dissent at 907. If the dissent’s construction of Oklahoma law were correct, then a jury would be compelled to impose the death penalty when it found that the aggravating circumstances outweighed the mitigating circumstances. In fact, the Oklahoma Court of Criminal Appeals and the Tenth Circuit have repeatedly held the opposite to be true. Under Oklahoma law, “[a] life sentence may be given even if the jury finds aggravating circumstances outweigh mitigating circumstances.” Le v. State, 947 P.2d 535, 554 n. 61 (Okla.Crim.App.1997); Bryan v. State, 935 P.2d 338, 364 (Okla.Crim.App.1997) (“As this Court has often held, a life sentence may be given notwithstanding a jury finding of aggravating circumstances which outweigh mitigating circumstances.”) (citing cases); see also LaFevers v. Gibson, 182 F.3d 705, 718 (10th Cir.1999) (“Under Oklahoma law, a jury is free to decline to impose the death penalty even if it finds that the aggravating circumstances outweigh the mitigating circumstances.”); Duvall v. Reynolds, 139 F.3d 768, 789-90 (10th Cir.1998) (same); Parks v. Brown, 860 F.2d 1545, 1563 (10th Cir.1988) (en banc) (“In the sentencing process, the determination of the number and seriousness of aggravating circumstances is merely a guideline for the jurors, a benchmark for considering the death penalty. If the jury finds that aggravating circumstances outweigh mitigating circumstances, imposition of the death penalty is constitutionally permissible; however, under Oklahoma law, the jury may still exercise its discretion by refusing to impose the death penalty.”) (emphasis added), rev’d on other grounds by Saffle v. Parks, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990).[5] Thus, even *919 though Oklahoma retains a weighing-based death penalty scheme, the discretion vested in its juries regarding the imposition of the death penalty is similar to that of the South Carolina juries whose deliberations were directly at issue in Simmons and Shafer. See Johnson v. State, 731 P.2d 993, 1003 (Okla.Crim.App.1987) (interpreting instruction that stated the jury “ ‘could be authorized to consider imposing a sentence of death’ if an aggravating circumstance were found” as subsuming “[t]he idea that the idea that the jury may decline to impose the death penalty even if aggravating circumstances are not outweighed by mitigating circumstances”), overruled on other grounds by Green v. State, 862 P.2d 1271 (Okla.Crim.App.1993).
Fourth, the dissent’s suggestion that, once rejected as an aggravator, the question of future dangerousness “cannot affect the jury’s moral judgment during the weighing of aggravating and mitigating circumstances,” Dissent at 909, unsoundly limits the evidence that may be properly considered. In spite of the jury’s failure to find the continuing threat aggravator beyond a reasonable doubt, the jury is entitled to “consider all evidence presented throughout the trial in determining what sentence the defendant should receive.” Parks v. State, 651 P.2d at 694 (citing Lockett v. Ohio, 438 U.S. 586, 606, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)) (emphasis supplied); see also Trial Trans, vol. VII, at 66-71 (prosecutor’s closing argument) (noting that “[a]ll evidence from the first stage has been introduced into this stage”). “[T]he sentence imposed at the penalty stage should reflect a reasoned moral response to the defendant’s background, character, and crime.” California v. Brown, 479 U.S. 538, 545, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) (O’Connor, J.,.concurring). “[T]o attempt to separate the sen-tencer’s decision from his experiences would inevitably do precisely that. It is entirely fitting for the moral, factual, and legal judgment of judges and juries to play a meaningful role in sentencing.” Barclay v. Florida, 463 U.S. 939, 950, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983).
Thus we cannot know the extent to which the prosecution’s evidence and argument regarding Mr. Mollett’s future dangerousness influenced the jury’s conclusion that a particular mitigating circumstance, such as the defendant’s generousness, gentle manner, caring and loving nature, and other compassionate qualities, did not outweigh the other aggravators. See Jury Instruction 51 (listing mitigating circumstances). Nor can we know how the jury reached this conclusion, and for good reason. See Barclay, 463 U.S. at 950, 103 S.Ct. 3418 (“It is neither possible nor desirable for a person to whom the state entrusts [such] an important judgment to decide in a vacuum.”).
Finally, we are in no way suggesting that the jury may disregard the judge’s *920 instructions regarding aggravating and mitigating circumstances. We have not “effectively converted Oklahoma into a nonweighing state.” Dissent at 934. Oklahoma retains a weighing-based scheme that requires that the jury “unanimously find that one or more aggravating circumstances existed beyond a reasonable doubt” before it is “authorized to consider imposing a sentence of death.” Jury Instruction 49; Okla. Stat. tit. 21, § 701.11. On the contrary, we are merely recognizing that, at sentencing, juries are free to consider all “constitutionally relevant evidence.” Boyde v. California, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990); see also Parks, 651 P.2d at 694 (noting that the Supreme Court in Lockett v. Ohio, 438 U.S. at 606, 98 S.Ct. 2954, “authorized the sentencer, in this case the jury, to consider not only the defendant’s record and character, but any circumstances of the offense”).
4. Should this court sua sponte reach the issue of harmless error?
The State of Oklahoma wholly failed to argue on appeal that the trial court’s instruction, if erroneous, should nonetheless be affirmed as harmless error. However, “ “we may exercise our discretion to initiate harmless error review in an appropriate case.’” United States v. Samaniego, 187 F.3d 1222, 1224 (10th Cir.1999) (quoting United States v. Torrez-Ortega, 184 F.3d 1128, 1136 (10th Cir.1999)) (emphasis supplied). In considering whether to do so, we have “cited with approval three factors suggested by the Seventh Circuit in determining whether an appellate court should address harmlessness when the government has failed to do so: (1) the length and complexity of the record; (2) whether the harmlessness of the errors is certain or debatable; and (3) whether a reversal would result in protracted, costly, and futile proceedings.” Samaniego, 187 F.3d at 1225 (citing Torrez-Ortega, 184 F.3d at 1136, in turn citing United States v. Giovannetti, 928 F.2d 225, 227 (7th Cir.1991)). However, “confusion about what the third factor contributes to the analysis has caused this and other courts to merely reference [the third factor] but not apply it.” Samaniego, 187 F.3d at 1225 n. 2.
Applying the first two factors then, we do not consider this to be an appropriate case for us to conduct a full-bore harmless error review “unassisted by briefing by the parties or consideration by the district court,” which did not in this case perform a harmless error analysis on the Simmons claim. Cook v. McKune, 323 F.3d 825, 840 n. 9 (10th Cir.2003). First, the record is lengthy and somewhat complex: the record is several thousand pages and covers a seven-day trial, including the government’s case against Mr. Mollett, which involved proving two crimes and then in a separate sentencing phase attempting to prove three different mitigating factors to convince the jury to impose the death penalty.
Second, and more importantly, the harmlessness of the Simmons error is “at best debatable.” Torrez-Ortega, 184 F.3d at 1136. In harmless error analysis in a capital case, we are mindful of the “need for heightened reliability in determining a capital sentence.” Johnson, 254 F.3d at 1155. See also Gardner v. Florida, 430 U.S. 349, 357-58, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (“From the point of view of society, the action of the sovereign in taking the life of one of its citizens ... differs dramatically from any other legitimate state action”); Andres v. United States, 333 U.S. 740, 752, 68 S.Ct. 880, 92 L.Ed. 1055 (1948) (“In death cases, doubts with regard to the prejudicial effect of trial error should be resolved in favor of the *921 accused.”); Andrews v. Shulsen, 802 F.2d 1256, 1263-64 (10th Cir.1986) (“[Because there is a qualitative difference between death and any other permissible form of punishment, ‘there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.’ ”) (quoting Zant v. Stephens, 462 U.S. 862, 864, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1982), in turn quoting Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion of Stewart, Powell, and’ Stevens, JJ.)) (emphasis supplied). With that critical need for reliability in mind, and assuming that harmless error analysis is applicable to a Simmons violation,[6] the question of whether the Simmons error in Mr. Mollett’s case was harmful is “debatable” in two respects.
First, when the jury, having found the two aggravators proven beyond a reasonable doubt, engaged in the required determination of whether to impose the death penalty based on, for each of aggravators, whether the “aggravating circumstance is outweighed by the finding of one or more mitigating circumstances,” Okla. Stat. tit. 21, § 701.11, the jury’s confusion about parole could well have influenced its verdict of death. Justice O’Connor in Simmons observed that the fact “that the jury in this case felt compelled to ask whether parole was available shows that the jurors did not know whether or not a life-sen-fenced defendant will be released from prison.” Simmons, 512 U.S. at 177-78, 114 S.Ct. 2187 (O’Connor, J., concurring). In holding that the defendant’s due process rights were violated, Justice O’Connor stated that “the prosecutor, by referring to a verdict of death as an act of ‘self-defense,’ strongly implied that petitioner would be let out eventually if the jury did not recommend a death sentence.” Id. (emphasis in original).
Similarly, the combination in Mr. Mol-lett’s case of the prosecutor’s focus on Mr. Mollett’s future dangerousness and the jury’s subsequent question to the trial judge directly implicates, and leaves unresolved in this case, the concerns articulated in Justice O’Connor’s opinion for the court in Simmons. In Mr. Mollett’s trial, the prosecutor, in closing argument on rebuttal, stated that “[tjhey say prison is good enough, he can’t get out,” Tr. Trans, vol. VII, at 80, that “[t]he people he meets there, the people he influences there, the people in contact with that mind there, they’ll come out,” id., that “[n]ot everyone in prison’s [sic] in there forever,” id. and, in his summation, warned the jury that “the cycle beings again.” Id. In the wake of this closing argument, the trial judge responded to the jury’s query by saying “[m]atters of parole are beyond the purvue [sic] of the jury or the court to consider,” and by refusing to permit Mr. Mollett to introduce evidence demonstrating that he was ineligible for parole. The trial judge’s *922 responses, which violated Mr. Mollett’s due process rights under Simmons, left the prosecutor’s warning about the danger of Mr. Mollett emerging from prison front and center for the jury to consider in its deliberations on whether to sentence Mr. Mollett to death.
Second, the trial court’s erroneous instruction may have made the jurors more likely to find the two aggravators charged in addition to continuing threat satisfied if the jurors were under the impression that both of the sentencing options involving life imprisonment involved the possibility of future parole, a point of confusion reflected in the jury’s question to the trial judge. Indeed, counsel for the State conceded at oral argument that at least some of the continuing threat evidence was relevant to the two aggravators found by the jury: that the murder was “especially heinous, atrocious or cruel,” and that Mr. Mollett committed the murder “to avoid lawful arrest or prosecution.” Okla. Stat. tit. 21, § 701.12. Neither in the State’s briefs, nor in its answers to our questions at oral argument, nor in our independent record review, have we discovered any evidence indicating that the jury found the two non-continuing threat aggravators pri- or to finding that the State had not proven the continuing threat aggravator. Although the jury decided that the continuing threat aggravator was not proved beyond a reasonable doubt, the jury may well have nonetheless considered continuing threat evidence in the deliberations over to what ultimate penalty to impose after it found the other two aggravators beyond a reasonable doubt: in capital cases, “the consequences of failure [are] so vital ... that the practical and human limitations of the jury system cannot be ignored.” Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), quoted in Simmons, 512 U.S. at 171, 114 S.Ct. 2187 (plurality).
Given these two concerns about the potential harm of the Simmons error, given the “need for heightened reliability in determining a capital sentence,” Johnson, 254 F.3d at 1166, and given that we are “loath,” Mayes v. Gibson, 210 F.3d 1284, 1291 (10th Cir.2000), “to speculate on the deliberative process of a jury,” id., we do not find it appropriate to relieve the government of the consequences of its failure to argue harmless error. We therefore decline to sua sponte reach the merits of the harmless error issue.
III. CONCLUSION
In closing, we emphasize the narrowness of this holding: in a case where all of the Simmons factors are aligned — that is, (1) a capital case where (2) the prosecution places future dangerousness at issue through the charging of a continuing threat aggravator; and (3) the jury requests an explanation of the definition of life imprisonment, and (4) the judge’s response creates a false choice — and where, as here, there was no opportunity to cure the confusion because counsel were not informed of the question, a defendant is entitled to relief. For the reasons detailed above, we conclude that the Oklahoma trial court “misapplied a governing legal principle to a set of facts different from those of the case in which the principle was announced,” Wiggins, — U.S. at-, 123 S.Ct. at 2535 (internal quotation marks omitted), and that the trial court’s error was “contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1). The federal district court therefore correctly granted habeas relief on Mr. Mollett’s due process claim. Consequently, we need not discuss the arguments concerning ineffective assistance *923 of counsel. See, e.g., Scott v. Mullin, 303 F.3d 1222, 1232 (10th Cir.2002). The district court’s conditional grant of Mr. Mollett’s 28 U.S.C. § 2254 petition for habeas corpus, including its finding that Mr. Mollett is “entitled to a new sentencing hearing,” id., is AFFIRMED.

. Mr. Mollett argued in his habeas petition that his Eighth and Fourteenth Amendment rights were violated. However, because Simmons only addressed the Fourteenth Amendment, see Simmons, 512 U.S. at 162 n. 4, 114 S.Ct. 2187 (plurality), and because the parties on appeal limited their arguments to that amendment, we limit our discussion to the Fourteenth Amendment.

. We note that this argument is somewhat misleading, because the juries in Simmons and Shafer could not have "rejected a statutory aggravator” finding that the defendant "was a continuing threat to society,” Aplt’s Br. at 17, because South Carolina’s statutory aggravators do not include the defendant's potential future dangerousness. See S.C. Stat. Ann. § 16-2-20(C)(a)(1) (11).

. Justice Ginsburg concurred separately, emphasizing that due process requires that "[w]hen the prosecution urges a defendant’s future dangerousness as cause for the death sentence, the defendant's right to be heard means that he must be afforded an opportunity to rebut the argument.” Simmons, 512 U.S. at 174, 114 S.Ct. 2187 (Ginsburg, J., concurring). "To be full and fair,” Justice Ginsburg stated, "that opportunity must include the right to inform the jury, if it is indeed the case, that the defendant is ineligible for parole.” Id. at 174, 114 S.Ct. 2187.
There is considerable support for Judge Chapel's and Judge Strubhar’s views that the court "should provide a meaningful answer to questions from the jury when they ask, as they often do, about the meaning of life without parole.” Mollett, 939 P.2d at 15 (Chapel, J. and Strubhar, J., concurring). In Simmons, Justice O’Connor observed the logical confusion of the jurors, when she stated that "[t]he rejection of parole by many States (and the Federal Government) is a recent development that displaces the longstanding practice of parole availability, and common sense tells us that many jurors might not know whether a life sentence carries with it the possibility of parole.” 512 U.S. at 177-78, 114 S.Ct. 2187 (O'Connor, J., concurring). Justice Thomas also noted in Kelly, that "[a]s a matter of policy, it may be preferable for a trial court to give such a[] [clarifying] instruction.” Kelly, 534 U.S. at 265, 122 S.Ct. 726 (Thomas, J., dissenting). And South Carolina, after three losses before the United States Supreme Court, has finally amended its statute to read as follows: "For purposes of this section, ‘life imprisonment’ means until death of the offender without the possibility of parole, and 'when requested by the State or the defendant, the judge must charge the jury in his instructions that life imprisonment means until the death of the defendant without the possibility of parole." S.C. Stat. Ann. § 16-3-20(A) (emphasis supplied).

. We disagree with the dissent's contention that, under the majority's theory, "a defendant in Oklahoma would be entitled to a jury instruction about parole eligibility even if the prosecution did not allege the continuing threat aggravating circumstances, so long as any of the evidence adduced in support of any other aggravating circumstance might also be relevant to future dangerousness.” Dissent at 927, n. 4. We note that, as in Kelly,
this is not an issue here, nor is there an issue about a defendant’s entitlement to instruction on a parole ineligibility law when the State's evidence shows future dangerousness but the prosecutor does not argue it. The only questions in this case are whether the evidence presented and the argument made at [Mr. Mollett's] trial placed future dangerousness at issue. The answer to each question is yes, and we need go no further than Simmons in our discussion.
Kelly, 534 U.S. at 254 n. 4, 122 S.Ct. 726.

. Oklahoma’s Uniform Jury Instructions also restate this proposition: *919 OWI-CR-4-80. Death Penalty Proceedings-Weighing Aggravating And Mitigating Circumstances
If you unanimously find that one or more of the aggravating circumstances existed beyond a reasonable doubt, the death penalty shall not be imposed unless you also unanimously find that any such aggravating circumstance or circumstances outweigh the finding of one or more mitigating circumstances. Even if you find that the aggravating circumstance(s) outweigh(s) the mitigating circumstance(s), you may impose a sentence of imprisonment for life with the possibility of parole or imprisonment for life without the possibility of parole.
OUJI-CR (2d) 4-80 (emphasis added); see McGregor v. State, 885 P.2d 1366, 1384 (Okla.Crim.App.1994) ("A life sentence may be given notwithstanding a jury finding of aggravating circumstances which outweigh mitigating circumstances, but an instruction on this point is not required.”).

. It is not entirely clear whether a Simmons error is subject to harmless error analysis, nor have the parties' briefs addressed this issue. On the one hand, the Supreme Court has stated that “[mjost constitutional errors can be harmless,” Neder v. United States, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (internal quotation mark omitted), and that "[i]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis.” Id. (quotation marks omitted). On the other hand, the Supreme Court has never performed a harmless error analysis in any of the three cases where the Court found a Simmons violation: neither in Simmons nor Shafer, nor in Kelly v. South Carolina, 534 U.S. at 254 n. 4, 122 S.Ct. 726, a more recent case in which the Supreme Court reversed a state court on Simmons grounds, did the Court engage in harmless error analysis, let alone hold that the error was harmless.